In re **VALLEY HEALTH SYSTEM, a California Local Health Care District, Debtor.**

**Prime Healthcare Management, Inc., a California corporation, et al., Plaintiffs,**

v.

**Valley Health System, a California Local Health Care District, et al., Defendants.**

**Bankruptcy No. 6:07–bk–18293–PC. Adversary No. 6:09–ap–01708–PC.**

United States Bankruptcy Court, C.D. California, Riverside Division.

April 8, 2010.

---

Marc W. Rappel, Esq., Robert A. Klyman, Esq., Nathan M. Smith, Esq., Latham & Watkins LLP, Los Angeles, CA, for Plaintiffs, Prime Healthcare Management, Inc., et al.

Gary E. Klausner, Esq., Stutman, Treister & Glatt, P.C., Los Angeles, CA, Daniel K. Spradlin, Esq., M. Lois Bobak, Esq., Woodruff, Spradlin & Smart, APC, Costa Mesa, CA, for Debtor and Defendant, Valley Health System.

R.D. Kirwan, Esq., Carlyle W. Hall, Jr., Esq., Akin Gump Strauss Hauer & Feld LLP, Los Angeles, CA, for Defendant, Physicians for Healthy Hospitals.

Samuel R. Maizel, Esq., Pachulski Stang Ziehl & Jones LLP, Los Angeles, CA, for the Official Committee of Unsecured Creditors.

Peter J. Mort, Murrieta, CA, for Kali P. Chaudhuri.

Jay N. Hartz, Esq., Robert A. Davis, Jr., Esq., Hooper Lundy & Bookman, Inc., Los Angeles, CA, for Hemet Community Medical Group, Inc.

**MEMORANDUM DECISION RE: CONFIRMATION OF FIRST AMENDED PLAN OF ADJUSTMENT OF DEBTS OF VALLEY HEALTH SYSTEM DATED DECEMBER 17, 2009, AS MODIFIED ON FEBRUARY 19, 2010, AND ADJUDICATION OF THE CHALLENGE ACTIONS**

PETER H. CARROLL, Bankruptcy Judge.

Valley Health System, a California Local Health Care District ("VHS") seeks confir-

mation of its First Amended Plan for the Adjustment of Debts of Valley Health System Dated December 17, 2009, as modified on February 19, 2010 (the "Modified First Amended Plan") pursuant to § 943(b) of the Bankruptcy Code,[1] dismissal of the complaint in the above referenced adversary proceeding, and adjudication of other causes of action alleged by Save the Hospitals, Inc.,[2] Prime Healthcare Services, Inc.,[3] Prime Healthcare Management, Inc.,[4] Albert L. Lewis, Jr. ("Lewis"), John Lloyd ("Lloyd"), and Edward J. Fazekas ("Fazekas")[5] that arise under state law and impact the feasibility of VHS's Modi-

fied First Amended Plan. At the hearing, Gary E. Klausner, Daniel K. Spradlin, and M. Lois Bobak appeared for VHS; R.D. Kirwan and Carlyle W. Hall, Jr. appeared for Physicians for Healthy Hospitals, Inc. ("PHH");[6] Marc W. Rappel, Robert A. Klyman, Nathan M. Smith, and Daniel P. Brunton appeared for Save the Hospitals, Inc., Prime Healthcare Services, Inc. and Prime Healthcare Management, Inc. (collectively, "Prime"), Lewis, Lloyd, & Fazekas;[7] Samuel R. Maizel appeared for the Official Committee of Unsecured Creditors (the "Committee");[8] Peter J. Mort appeared for Kali P. Chaudhuri, M.D.

1. Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 after its amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109–8, 119 Stat. 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable certain Federal Rules of Civil Procedure ("F.R.Civ.P."). "AR" references are to the 1,822–page administrative record lodged by VHS with the court on February 1, 2010.

2. Save The Hospitals, Inc. is a California corporation organized on October 15, 2009. The corporation's principal place of business is Ontario, California. Save The Hospitals, Inc. does not have any public members. It is not a creditor in VHS's bankruptcy case nor is it a resident or taxpayer in the VHS district.

3. Prime Healthcare Services, Inc. is a Delaware corporation, qualified to do business in California. Prime Healthcare Services, Inc. is owned by Prem Reddy, M.D. ("Reddy") (10% interest) and the Prem Reddy Family Foundation (90%). Reddy, in turn, is the sole director and member of the Prem Reddy Family Foundation, which has no employees. Prime Healthcare Services, Inc., by and through its affiliates and subsidiaries, owns and operates 13 acute care hospitals throughout California. None of the hospitals are located within the geographic borders of the VHS district, nor is the corporation a resident or taxpayer in the VHS district.

4. Prime Healthcare Management, Inc. is a California corporation conducting business in

California. Reddy owns 100% of Prime Healthcare Management, Inc., which provides management services to Prime Healthcare Services, Inc. Prime Healthcare Management, Inc. is not a creditor in VHS's bankruptcy case nor is it a resident or taxpayer in the VHS district.

5. Lewis, Lloyd, and Fazekas are citizens of California and residents of Riverside County. Lewis, Lloyd, and Fazekas each reside in communities within the geographic boundaries served by the VHS district. Lewis, Lloyd and Fazekas are not creditors of VHS.

6. PHH is a Delaware corporation organized on June 18, 2009. PHH is qualified to do business in California. The directors and officers of PHH are: Sreenivasa Nakka, M.D., President and Director; Ratan Tiwari, M.D., Vice President and Director; Bhoodev Tiwari, M.D., Vice President; Girdhari Purohit, M.D., Vice President; and Anil Rastogi, M.D., Secretary/CFO.

7. Save the Hospitals, Inc., Prime, Lewis, Lloyd, and Fazekas are, at times, collectively referred to as "the petitioners."

8. The Committee appointed on March 26, 2008, consists of (a) SEIU, United Healthcare Workers—West ("SEIU"); (b) Universal Health Services of Rancho Springs, Inc.; (c) LHIO, LLC ("LHIO"); (d) Sodexo USA, Inc.; (e) HCR Manor Care, Inc.; (f) Hemet Healthcare Surgery, Inc.; (g) Anaheim Memorial Medical Center; (h) HCMG; and (i) Southland Endoscopy Center.

("Chaudhuri"); Nathan F. Coco appeared for U.S. Bank, as Indenture Trustee for the holders of the Valley Health System Certificates of Participation (1993 Refunding Project) and the Valley Health System District Revenue Bonds (Refunding and Improvements Project) 1996 Series A ("U.S. Bank"); and Jay N. Hartz and Robert A. Davis, Jr. appeared for Hemet Community Medical Group, Inc. ("HCMG"). The court, having considered VHS's Modified First Amended Plan, the petitioners' objections thereto,[9] the petitioners' claims against VHS under state law,[10] the evidentiary record, and arguments of counsel, makes the following findings of fact and conclusions of law [11] pursuant to F.R.Civ.P. 52(a)(1), as incorporated into FRBP 7052 and applied to contested matters by FRBP 9014(c).

## I. STATEMENT OF FACTS

### A. VHS—The District

VHS is a public agency formed in 1946 under the State of California Local Health Care District Law ("LHCDL").[12] VHS serves a district that encompasses 882 square miles in the San Jacinto Valley in Riverside County, California, with a population within the district of nearly 360,000. At its inception, VHS operated only an 18-bed hospital purchased from the city of Hemet, California. On the petition date, VHS owned and operated the Hemet Valley HealthCare Center (the "Skilled Nursing Facility"), a 113-bed skilled nursing facility in Hemet, California, together with three acute hospitals—Hemet Valley Medical Center ("Hemet Hospital"), a 340-bed facility in Hemet, California; Menifee Valley Medical Center ("Menifee Hospital"), an 84-bed facility in Sun City, California; and Moreno Valley Community Hospital ("Moreno Valley Hospital"), a 95-bed facility in Moreno Valley, California. The Moreno Valley Hospital and its primary service area were situated outside VHS's boundaries. Each of the hospitals provided comprehensive health services and 24-hour emergency medical services.[13]

The cost of VHS's comprehensive health care system was financed, in large part, by

9. Save the Hospitals, Inc., Prime Healthcare Services, Inc., Lewis, Lloyd, and Fazekas object to confirmation of the VHS's Modified First Amended Plan.

10. Prime Healthcare Management, Inc., Lewis, Lloyd, and Fazekas allege certain claims against VHS and PHH under state law. The parties have stipulated to the jurisdiction of this court to decide such claims in conjunction with confirmation of VHS's Modified First Amended Plan. See Stipulation, infra note 39.

11. To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.

12. Cal. Health & Safety Code § 32000, et seq. Residents within VHS's territorial boundaries do not pay any taxes to VHS.

13. Services offered at the Hemet Hospital include the Emory J. Cripe Radiation Therapy Treatment Center for cancer treatment; cardiac care services; inpatient and outpatient surgical services; behavioral health services; speech, physical, and occupational therapy services; and CT imaging and magnetic resonance imaging. The Menifee Hospital provided inpatient and outpatient X-ray services, including mammography, CT scan, and MRI services; a critical care unit; inpatient and outpatient surgery; inpatient and outpatient laboratory services; respiratory services; physical therapy services; a joint replacement center; and cataract and retina specialty surgeries. The Moreno Valley Hospital offered inpatient medical, surgical and pediatric services; critical care, post-critical care, and telemetry units; maternity and women's services; obstetrics; inpatient and outpatient surgery; the Spine Center of Excellence program; cardiopulmonary services; and physical rehabilitation services.

two series of bonds issued by VHS (collectively, the "Bonds"): (1) the $61,650,000 Valley Health System Certificates of Participation (1993 Refunding Project); and (2) the $47,335,000 Valley Health System District Revenue Bonds (Refunding and Improvements Project) 1996 Series A. U.S. Bank, VHS's largest creditor, was owed approximately $84 million in principal and interest on the Bonds as of the date of the petition.

## B. *Events Leading to Bankruptcy*

Before filing its petition, VHS communicated with its major creditors, including U.S. Bank, and the two labor unions that had been certified as the bargaining representatives for certain VHS employees—SEIU and the California Nurses Association ("CNA"). VHS advised its creditors and the unions of its intention to seek relief under chapter 9, and assured them that it would negotiate a plan of adjustment consistent with the requirements of chapter 9 once it developed a viable business plan. VHS's Board of Directors approved the chapter 9 filing only after a public meeting, noticed in accordance with state law, at which attendees were advised of VHS's intention to file a chapter 9 petition and given the opportunity to question the board of directors and its professionals and to be heard on the issue. VHS's decision "was made only after a careful review of all options and strategies and with the input and guidance of consultants with expertise in healthcare restructuring, corporate counsel, bond counsel, and bankruptcy counsel."[14]

VHS sought relief under chapter 9 only after exhausting its efforts to solve its financial problems through an out-of court restructuring of debt or the sale of its assets. Two years earlier, VHS had attempted to restructure its debt through Riverside County Measure I ("Measure I") which contemplated the issuance of $485 million in general obligation bonds, secured by property tax revenues, to retire VHS's special revenue bond debt, finance necessary capital improvements, and provide VHS the time and capital required to return to profitability. Measure I was rejected by the voters on September 16, 2005. VHS then attempted to improve its liquidity through the sale of assets.

On August 8, 2007, VHS approved a sale of substantially all of its assets to Select HealthCare Solutions ("Select"), subject to voter approval in accordance with California law. Select and VHS further agreed that, in the event the sale was not approved by the voters, then Select would have the opportunity to purchase the Moreno Valley Hospital from VHS for $47 million. Voters rejected Riverside County Measure G ("Measure G"), which sought approval of the asset sale to Select, on November 6, 2007—37 days before VHS filed its chapter 9 petition. The Moreno Valley Hospital was generating monthly losses of between $300,000 to $500,000, and Select had not pursued its opportunity to purchase the hospital from VHS prior to the petition date.

VHS's method for generating revenue exacerbated its operating losses. VHS derived its income from a complicated system of capitation and sub-capitation agreements. VHS was losing money under its capitation contracts, as well as the associated capitation risk pools formed with certain physician groups. The unpaid risk pool liability alone associated with these capitation contracts exceeded $16 million

---

**14.** VHS's Reply to Objection of U.S. Bank as Indenture Trustee and Limited Objection of SEIU United Healthcare Workers—West and Local 121 RN to Chapter 9 Petition of Valley Health System, 3:1–3.

on the petition date, and VHS had not reserved funds for the payment of these liabilities.

QHR Consulting Services ("QHR"), a turnaround specialist, was retained by VHS on October 15, 2007 to analyze VHS's operations and complex contractual relationships, stabilize VHS's financial situation, and assist in formulating a business plan to return VHS to profitability. QHR examined VHS's $250 million annual budget before undertaking the task of framing a meaningful business plan. Based on its preliminary findings, QHR recommended operational changes to increase VHS's revenues by approximately $12 million without materially increasing expenses and to eliminate approximately $20 million in annual expenses with no degradation to the quality of VHS's operations. QHR determined that the key to returning VHS to profitability, however, hinged upon (1) negotiating fee for service agreements to replace its capitation contracts; and (2) consummating a sale of the Moreno Valley Hospital.

## C. VHS's Chapter 9 Petition

On December 13, 2007, VHS filed a voluntary petition under chapter 9 in this case disclosing approximately 5,000 creditors holding claims in excess of $100 million. On January 11, 2008, the court denied the United States trustee's motion seeking appointment of a patient care ombudsman pursuant to § 333(a)(1).[15] On February 20, 2008, the court overruled the objections of U.S. Bank and SEIU to VHS's petition and denied U.S. Bank's motion to dismiss, holding that VHS had established that it was eligible for relief under chapter 9 and "was unable to negotiate with creditors prior to the filing of its chapter 9 petition ... because negotiation was impracticable within the meaning of § 109(c)(5)(C)."[16]

## D. Relevant Events During Bankruptcy

After the filing of the petition, VHS renegotiated its contracts with Blue Cross, Health Net, PacifiCare (United Health Care), Secure Horizons (United Health Care), Inter Valley, Inland Empire Health Plan, and SCAN resulting in an estimated $1.2 million per month reduction in operating losses. Extensive negotiations between VHS, Select and Kaiser Hospital Foundation ("Kaiser") resulted in a court-approved sale of the Moreno Valley Hospital to Kaiser for approximately $53 million on May 20, 2008, which, among other things, reduced VHS's debt to Select by $10.4 million and VHS's liability to U.S. Bank on the Bonds by nearly $40 million. VHS closed the Skilled Nursing Facility in December 2008,[17] sold its interest in Hemet Global Services to HCMG for $3.4 million, and successfully renegotiated its labor agreements with CNA and SEIU.

On May 21, 2009, VHS posted public notice under the Brown Act[18] that the

---

15. *In re Valley Health Sys.*, 381 B.R. 756, 765 (Bankr.C.D.Cal.2008).

16. *In re Valley Health Sys.*, 383 B.R. 156, 165 (Bankr.C.D.Cal.2008).

17. VHS continues to operate a chemical dependency and post-treatment retreat center on grounds previously occupied by the Skilled Nursing Facility.

18. Under the Brown Act, the legislative body of a local agency, or its designee, must post an agenda at least 72 hours before a regular meeting briefly describing each item of business to be transacted or discussed at the meeting. Cal. Gov't Code § 54954.2(a). The Brown Act also provides that a special meeting may be called at any time upon 24 hours notice specifying the time and place of the special meeting and the business to be transacted or discussed. Cal. Gov't Code § 64956. Michael Sarrao, Vice President and General Counsel for Prime Healthcare Services, Inc. ("Sarrao"), received email notification of

VHS Board of Directors would meet on May 27, 2009, to consider VHS's most recent financial statements. At the meeting on May 27, 2009, Melanie Van Winkle, Vice President of Finance, presented the Board of Directors with VHS's financial statements for the ten month period ending April 30, 2009. The statements confirmed that, despite fundamental changes in VHS's operations, VHS was continuing to operate at a substantial loss. In response thereto, the VHS Board of Directors formed an Ad Hoc Subcommittee of three board members, Vinay M. Rao, Glen Holmes, and Amelia Hippert, to oversee "all aspects of the development and implementation of a financial restructuring plan for the District." [19]

On June 26, 2009, VHS posted public notice that its Board of Directors [20] would meet on June 29, 2009, to consider VHS's most recent financial statements and operating plans. At the meeting on June 29, 2009, Hippert announced that VHS would henceforth "pursue a dual track in addressing [VHS's] severe financial problems," stating that VHS would both "honor [its] commitment to developing and implementing fiscal controls to stem continued losses," and "simultaneously explore the potential sale of [VHS's] assets." [21]

VHS sustained a net loss of approximately $7.5 million for the fiscal year ending June 30, 2009. Although an improvement over the $17.8 million loss for the prior fiscal year, VHS projected that it would do no better than break even from operations for the fiscal year ending June 30, 2010. Heeding concerns of the Committee and U.S. Bank that it could run out of cash by spring of 2010, VHS weighed all strategic options and slowly shifted the focus of a proposed plan of adjustment from a financial restructuring of the district to a sale or lease of its remaining two facilities—Hemet Hospital and Menifee Hospital.

On July 14, 2009, VHS posted public notice that its Board of Directors would meet on July 15, 2009, to consider approval of an agreement with The Peira Group for consulting services in connection with a potential sale of VHS's assets. On July 15, 2009, the VHS Board of Directors approved a consulting agreement with The Peira Group at a public meeting.

### E. *VHS's Plan of Adjustment*

#### 1. *Exclusive Negotiation Agreement*

On July 24, 2009, PHH contacted VHS regarding its interest in purchasing substantially all of VHS's assets. To expedite the negotiations, PHH requested an exclusive right to negotiate with VHS for a period of 90–days regarding a purchase of its assets and provided a draft agreement (the "letter agreement") for VHS to consider at its next meeting. That day, VHS posted public notice that its Board of Directors would meet on July 27, 2009, to

---

each of the relevant VHS Board of Directors' meetings at issue in this case. Prime does not raise any legal challenge regarding whether the notice or agenda posted by VHS for each of these regular or special meetings of VHS's Board of Directors met the requirements of the Brown Act.

**19.** Joint Pre–Trial Order, 7:8–9.

**20.** At all material times after June 24, 2009, the VHS Board of Directors consisted of the following members: William Cherry, M.D. ("Cherry"), Chairman; Amelia Hippert ("Hippert"), Vice Chairwoman; Robert O'Donnell ("O'Donnell"), Secretary; Vinay M. Rao ("Rao"), Treasurer; Tom Wilson ("Wilson"), Director; Glen Holmes ("Holmes"), Director; and Madaleine Dreier ("Dreier"), Director.

**21.** AR00026.

consider approval of the letter agreement between VHS and PHH.

At the meeting on July 27, 2009, the VHS Board of Directors voted 5–2 to approve the letter agreement between VHS and PHH with Cherry, Hippert, Dreier, Holmes, and Rao voting for approval. On July 30, 2009, VHS executed a letter agreement with PHH, effective on July 27, 2009, pursuant to which VHS agreed to negotiate exclusively with PHH for a period of 90 days for the sale of substantially all of its assets, including the Hemet Hospital and Menifee Hospital.

On July 30, 2009, Universal Health Services ("Universal"), a publicly traded company, sent Cherry a letter expressing its interest in purchasing substantially all of VHS's healthcare facilities for approximately $25 million. By letter dated August 13, 2009, Prime also advised VHS of its interest in purchasing substantially all of VHS's assets, including the Hemet Hospital and Menifee Hospital, for an unspecified amount. On August 14, 2009, VHS responded that VHS was subject to an exclusive negotiation agreement with PHH.

### 2. *Memorandum of Understanding and Term Sheet*

On September 15, 2009, VHS posted public notice that its Board of Directors would meet on September 16, 2009, to consider, among other things, a proposed Memorandum of Understanding and Term Sheet ("MOU/TS") between VHS and PHH concerning the sale of substantially all of VHS's assets to PHH for an estimated price of $156,000,000. On September 16, 2009, VHS's Board of Directors, at the conclusion of a public session, voted 6–1 to approve a non-binding MOU/TS providing for the sale of substantially all of VHS's assets to PHH, subject to voter approval. Cherry, Hippert, Dreier, Holmes, Rao, and Wilson voted to approve the MOU/TS and three resolutions calling for a special election. An initiative election to secure voter approval was scheduled for December 15, 2009. The MOU/TS further provided that, in the event the sale was not approved by voters, VHS would sell the Menifee Hospital to PHH but retain and continue to operate the Hemet Hospital (the "Alternate Sale"). VHS and PHH agreed to "negotiate, finalize and enter into a mutually acceptable form of an Asset Sale Agreement . . . , on terms generally consistent with the terms of [the MOU/TS], and to reasonably resolve any other issues not addressed [by the MOU/TS], by October 5th, 2009." [22]

### 3. *Fair Consideration Opinion*

On October 5, 2009, Valuation & Information Group ("V & IG") [23] presented the VHS Board of Directors with a document entitled "An Assessment and Comparison Between the Fair Market Value of Valley Health System and Related Assets and The Transaction Consideration By and Between PHH for Healthy Hospitals and Valley Health System" (the "Fair Consid-

---

**22.** AR01542.

**23.** V & IG is a healthcare valuation and financial consulting business serving clients throughout the nation. V & IG is composed of licensed and experienced real estate appraisers, financial analysts, and healthcare industry professionals. V & IG had been retained by VHS to prepare an appraisal of (a) the Hemet Hospital; (b) the Menifee Hospital; (c) the three vacant parcels adjacent to the Menifee Hospital; (d) the Skilled Nursing Facility; (e) the Hemet Valley Medical Arts Building; and (f) five accessory buildings. VHS and Prime, which each engaged the professional services of V & IG on unrelated matters prior to the sale at issue in this case, stipulated that V & IG is a qualified appraiser for purposes of California Health & Safety Code § 32121(p).

eration Opinion"). In conjunction with the Fair Consideration Opinion, V & IG appraised the following properties of VHS:

| Property | Value As of August 5, 2009 |
|---|---|
| Hemet Hospital | $27,830,000 [24] |
| Menifee Hospital | 25,800,000 [25] |
| Menifee—Adjacent Vacant Parcels | 6,830,000 [26] |
| Skilled Nursing Facility | 4,500,000 [27] |
| Hemet Valley Medical Arts Building | 8,700,000 [28] |
| Five Accessory Buildings | 3,330,000 [29] |

V & IG concluded in its Fair Consideration Opinion that, as of August 5, 2009, "[t]he Transaction Consideration of $169.773 million (including approximately $55 million of disputed claims) by and between PHH and VHS is equal to or greater than our estimate of the fair market value of the VHS Assets to be transferred in the Transaction, and that such amount constitutes fair and reasonable consideration to be received by VHS for the transferred assets as provided in Health & Safety Code Section 32121(p)." [30] With the Fair Consideration Opinion, the terms and conditions of the MOU/TS were reduced to an Asset Sale Agreement ("ASA") between VHS and PHH.

### 4. Asset Sale Agreement

On October 5, 2009, VHS posted public notice that its Board of Directors would meet on October 6, 2009, to consider approval of the ASA between VHS and PHH. On October 6, 2009, the VHS Board of Directors, at the conclusion of a public session, voted 6–1 to approve the ASA substantially in the form presented to the directors. Cherry, Hippert, Dreier, Holmes, Rao, and Wilson voted to approve the ASA. The ASA was executed on October 14, 2009.

On November 2, 2009, VHS filed a disclosure statement and proposed plan of adjustment predicated upon the asset sale alternatives set forth in the ASA. At the election on December 15, 2009, VHS's proposal to sell substantially all of its assets to PHH received voter approval by a wide margin.[31] On December 16, 2009, VHS filed its First Amended Plan for the Adjustment of Debts of Valley Health System Dated December 17, 2009 ("First Amended Plan"), together with a First Amended Disclosure Statement With Respect to the Plan for the Adjustment of Debts of Valley Health System Dated December 17, 2009 ("First Amended Disclosure Statement") deleting any reference to the Alternate Sale.[32] By order entered on December 23,

**24.** AR00901. V & IG's appraisal of Hemet Hospital states a value of $27,330,000 as of August 5, 2009. V & IG increased this valuation by $500,000 in its Fair Consideration Opinion.

**25.** AR00473.

**26.** AR00474.

**27.** AR01247. V & IG's appraisal of the Skilled Nursing Facility states a value of $4,550,000 as of August 5, 2009. V & IG reduced this valuation by $50,000 in its Fair Consideration Opinion.

**28.** AR01093.

**29.** AR00703.

**30.** AR01602.

**31.** The Riverside County Registrar of Voters certified the election results as 87.07% in favor of the sale and 12.93% in opposition to the sale. *See* Exhibit 247.

**32.** The ASA, as incorporated into VHS's First Amended Plan, will, among other things: (a) cause the allowed claims of VHS's bondholders [Classes 1A and 1B] (net of reserves held by VHS) to be paid in full, in cash at the time of the closing of the ASA; (b) provide VHS with $4 million cash to be used for payment of those administrative claims that are not being assumed by PHH at closing as well as additional funds that may be needed to pay administrative expenses; (c) provide $1.7 million, in installments through the fourth anniversary of the closing under the ASA, to the holders of allowed general unsecured claims of VHS [Class 2A], which sum may be adjusted upward or downward, depending on the

2009, the court approved VHS's First Amended Disclosure Statement, established confirmation procedures, and set a hearing on confirmation of VHS's First Amended Plan for February 9, 2010.

### F. The Challenge Actions

Due to the 90–day exclusivity agreement that preceded the MOU/TS and ASA, Prime was blocked from negotiating the terms of a competing offer to purchase the assets of VHS. As a result, Prime took steps to prevent consummation of the sale between VHS and PHH (the "Challenge Actions").

### 1. The Measure P Action

On October 15, 2009, Lewis filed a complaint against Barbara Dunmore, Registrar of Voters for the County of Riverside, in Case No. RIC538119, styled *Lewis v. Dunmore,* in the Superior Court of California, County of Riverside, seeking to enjoin Dunmore from placing Measure P on the ballot for the election on December 15, 2009. Lewis asserted that the language of Measure P, as adopted by VHS's Board of Directors, allegedly was false and mislead-

ing. Lewis's complaint named VHS and Cherry, its Chairman of the Board, as the "Real Parties in Interest." [33] On October 23, 2009, the Superior Court denied Lewis's request for a hearing on shortened time and the election went forward on December 15, 2009.

### 2. The Public Records Act Action

On October 27, 2009, Prime filed a complaint in Case No. RIC538931, styled *Prime Healthcare Management, Inc. v. Valley Health System, et al.,* in the Superior Court of California, County of Riverside, to compel the disclosure of documents concerning the sale to PHH contemplated by the ASA, including certain reports completed by The Peira Group (the "Peira Reports") and the "Evaluation Material" referred to in the letter agreement between VHS and PHH dated July 27, 2009, pursuant to the California Public Records Act.[34] At an expedited hearing on November 23, 2009, the state court ordered VHS to produce the Peira Reports for inspection and copying by Prime not later than December 4, 2009. On December 3, 2009,

---

total amount of administrative claims that are not assumed by PHH at closing; (d) assume substantially all of VHS's post-petition obligations; (e) cause the 5% unsecured promissory note of VHS payable to Select VHS Acquisition Company, LLC in the approximate amount of $8.9 million that is entitled to administrative priority status, to be satisfied; (f) pay VHS the sum of $400,000 per year for a period of five years to sustain it as a California Local Health Care District; (g) assume VHS's obligations for accrued employee paid time off; (h) assume VHS's obligations for accrued extended sick leave; (i) maintain core services, such as basic emergency services for at least five years as provided for in the ASA; (j) cause certain disputed claims filed in VHS's bankruptcy case, which PHH estimates to total approximately $55 million, to be assumed by PHH and withdrawn; (k) employ substantially all of VHS's employees; (*l*) assume the collective bargaining agree-

ments with SEIU and CNA; (m) accept an immediate assignment of the executory contracts and unexpired leases that PHH notifies VHS to assume; and (n) pay the premiums for error and omissions tail insurance for VHS ($3.75 million) and director and officer tail insurance ($450,000).

**33.** Lewis did not seek relief from the automatic stay before proceeding with the state court action.

**34.** Cal. Gov't Code § 6250, *et seq.* Prime's lawsuit was preceded by a "Notification of Intent to File State Court Action Against Debtor for Violation of California Public Records Act" filed with this court on October 27, 2009. Prime did not seek relief from the automatic stay before commencing the lawsuit, reasoning that its claims are based upon or arise out of VHS's acts or omissions taken after the petition date.

the Fourth District Court of Appeal issued a stay of the trial court's order.

### 3. *The CEQA Action*

On November 6, 2009, the petitioners filed a Verified Petition for Writ of Mandate; Complaint for Declaratory Relief and Injunctive Relief in Case No. RIC539783, styled *Prime Healthcare Management, Inc., et al. v. Valley Health System, et al.*, in the Superior Court of California, County of Riverside. In their complaint, the petitioners allege, in pertinent part, that the ASA between VHS and PHH constitutes a "project" within the scope of the California Environmental Quality Act ("CEQA"),[35] and that VHS abused its discretion by failing to perform an environmental analysis pursuant to CEQA before placing the ASA on the ballot for voter approval.[36] The petitioners further allege that because PHH would likely develop the agricultural property adjacent to the Menifee Hospital, VHS abused its discretion by failing to obtain planning agency approval for the proposed sale in violation of California Government Code § 65402.[37] On December 3, 2009, VHS filed a notice with the state court removing the action to this court under Adversary No. 6:09–ap–01708–PC.

### 4. *The Government Code § 1090 Action*

On October 13, 2009, the petitioners filed a motion seeking relief from the automatic stay to file a complaint for an injunction and declaratory judgment in state court specifically to "obtain an order voiding the ASA and requiring a fair and open sale process before the scheduled voter referendum on December 15, 2009."[38] The petitioners alleged that "cause" existed for relief from the stay because (a) the VHS Board of Directors illegally approved a sale of substantially all of its assets to PHH without entertaining bids by other potential purchasers; (b) at the time the ASA was approved, certain members of VHS's Board of Directors had a financial interest in the transaction because they were employed by, or derived financial benefits from, Chaudhuri, one of the principals of PHH, in violation of California Government Code § 1090; and (c) VHS failed to obtain approval from the Riverside Local Agency Formation Commission ("Riverside LAFCO") of its decision to exit the hospital business in violation of the Cortese–Knox–Hertzberg Local Government Reorganization Act of 2000, California Government Code § 56000, *et seq.* ("Cortese–Knox").

After an expedited hearing on November 2, 2009, and a continued hearing on

---

**35.** Cal. Pub. Res.Code § 21000, *et seq.*

**36.** Between October 12–18, 2009, Prime executed written agreements with Lewis, Lloyd, and Fazekas under the terms of which Prime agreed to indemnify and hold Lewis, Lloyd, and Fazekas each harmless "from and against any and all liability, loss, fines, penalties, damage, claims or causes of action and expenses associated therewith (including, without limitation, court costs and attorneys' fees) caused directly or indirectly by [each of them] serving as a plaintiff in an action against Valley Health System and its Board of Directors." *See* Exhibits 248:1, 249:2, and 250:2.

**37.** The petitioners' lawsuit was preceded by a "Notification of Intent to File State Court Action Against Debtor for Violation of the California Environmental Quality Act" filed with this court on November 3, 2009. The petitioners did not seek relief from the automatic stay before commencing the lawsuit.

**38.** The petitioners' Memorandum of Points and Authorities in Support of Motion for Relief from Automatic Stay to Pursue State Court Litigation, 2:20–22.

November 12, 2009, the court denied the petitioners' request for relief from the automatic stay by order entered on November 23, 2009 (the "November 23rd Order"). Before the November 23rd Order was entered, the petitioners' filed a document entitled "Renewed Motion for Relief from the Automatic Stay" re-urging its request for stay relief to commence the Government Code § 1090 Action and belatedly seeking modification of the stay to pursue the CEQA Action. On November 30, 2009, the court denied the petitioners' request for an expedited hearing on the "renewed" motion. On December 7, 2009, the petitioners filed a notice of appeal with respect to the November 23rd Order and a statement electing to have the appeal adjudicated by the district court.

On January 20, 2010, VHS and the petitioners filed a Stipulation to Withdraw Renewed Motion for Relief from Stay, Dismiss Appeal and To Adjudicate Issues Raised by Challenge Actions ("Stipula-tion") pursuant to which the petitioners withdrew the "renewed" motion and agreed to dismiss their appeal of the November 23rd Order. VHS and the petitioners also stipulated to this court's jurisdiction to adjudicate the claims raised in the Challenge Actions in conjunction with confirmation of VHS's First Amended Plan.[39] An order approving the stipulation was entered on January 22, 2010. The appeal pending before the district court under Case No. EDCV–09–02264 SVW was dismissed on January 29, 2010. On February 1, 2010, VHS lodged the 1,822–page administrative record relating to VHS's administrative proceedings for its challenged approval of the ASA.

## G. The Confirmation Hearing

On February 9, 2010, the court commenced a hearing on confirmation of VHS's First Amended Plan. The petitioners timely filed an objection to confirma-

---

**39.** Pursuant to the Stipulation, VHS and the petitioners agreed that:

> C. Subject to paragraph D. below, the Bankruptcy Court shall hear and decide: (1) all of the causes of action set forth in the Challenge Actions, including those set forth in the First Amended Complaint, and (2) all grounds for opposing the Sale.... The Bankruptcy Court shall have the authority to make any findings and orders and to grant any relief that could be granted by a state court of competent jurisdiction in ruling on [the petitioners'] claims ... that (1) the PHH transaction does not provide "fair value" for [VHS's] assets; (2) member(s) of the VHS board who voted to approve the PHH transaction had conflict(s) of interest prohibited by California Government Code section 1090 *et seq.*; (3) the PHH transaction required approval by LAFCO under Government Code section 56824.12; (4) VHS violated CEQA in connection with the PHH transaction; and (5) the VHS board breached its fiduciary duty in approving the ASA with a "no shop" provision as set forth in section 4.7 thereof (collectively, the "State Law Claims").

> D. To the extent that [the petitioners] assert any grounds for opposing the Sale (other than the State Law Claims) that challenge the feasibility of [VHS's First Amended Plan] or otherwise raise issues of bankruptcy law: (1) nothing herein contained shall constitute an admission or concession that any of the [petitioners] have standing or qualify as "parties in interest" for purposes of appearing or being heard in connection with [VHS's] Plan, (2) such objections shall be governed by and decided under applicable provisions of the Bankruptcy Code and cases decided thereunder, and (3)[VHS] reserves all rights to oppose, defend against and dispute any such Plan objections and the bankruptcy court's authority to grant any relief related thereto other than to deny confirmation of its Plan. Stipulation, 2:13–3:5. The Stipulation is silent as to the petitioners' claim that the sale contemplated by VHS's First Amended Plan violates California Government Code § 65402.

tion, arguing that VHS's First Amended Plan was neither "in the best interest of creditors" nor "feasible" as required by § 943(b)(7). The petitioners argued that the plan was not feasible for two reasons not tied to the Challenge Actions: "First, PHH may be prohibited from owning the health care facilities comprising the bulk of VHS' assets in light of pending federal health care legislation which sets forth a deadline by which a physician-owned hospital must have a Medicare provider agreement in place in order to avail itself of the exception permitting physician ownership of a hospital. Second, it is not clear that PHH has or will be able to obtain the financing necessary to effectuate the proposed purchase of substantially all of VHS' assets." [40] Beckman Coulter, Inc., Key Equipment Finance, Inc., and U.S. Bank, which had also filed timely objections to confirmation of VHS's First Amended Plan, withdrew their objections prior to the confirmation hearing.

At the hearing, the court determined that VHS's First Amended Plan satisfied the requirements of § 943(b)(1) through (6).[41] The court overruled the petitioners' objection premised on § 943(b)(7) in part, finding that the plan is in the best interests of creditors[42] and that the mere existence of pending federal health care legislation did not render the plan infeasible.[43] The court continued the confirmation hearing to February 22, 2010, for an evidentiary hearing with respect to

**40.** Objection to Confirmation of First Amended Plan for the Adjustment of Debts of Valley Health System Dated December 17, 2009 by Save the Hospitals, Inc.; Prime Healthcare Services, Inc.; Albert L. Lewis, Jr.; John Lloyd; and Edward J. Fazekas, 3:7–12. The petitioners do not allege in their objection that the sale contemplated by VHS's First Amended Plan violates California Government Code § 65402.

**41.** Section 943 sets forth seven requirements for confirmation of a plan in chapter 9. 11 U.S.C. § 943(b). Section 943(b)(1) also requires that the plan comply with certain chapter 11 confirmation standards made applicable to chapter 9 cases by § 901. 11 U.S.C. § 943(b)(1). Section 901(a) incorporates the plan confirmation requirements of §§ 1129(a)(2), (a)(3), (a)(6), (a)(8), (a)(10), (b)(1), (b)(2)(A), and (b)(2)(B). 11 U.S.C. § 901(a). The debtor bears the burden of satisfying the confirmation requirements of § 943(b) by a preponderance of the evidence. *In re Pierce County Hous. Auth.*, 414 B.R. 702, 715 (Bankr.W.D.Wash.2009); *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 31 (Bankr. D.Colo.1999). Once these standards are met, the court must confirm the plan. *Pierce County*, 414 B.R. at 715; *see* 6 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 943.03, at 943–7 (15th ed. Rev.2009).

**42.** With respect to the "best interest" requirement of § 943(b)(7), the court determined that VHS's First Amended Plan provides "a better alternative for creditors than what they already have" and is fair and equitable. *See Mount Carbon*, 242 B.R. at 34.

**43.** The court hereby adopts and incorporates herein by reference its findings of fact and conclusions of law regarding confirmation of VHS's First Amended Plan stated orally and recorded in open court at the confirmation hearing on February 9, 2010, pursuant to F.R.Civ.P. 52(a)(1), as incorporated into FRBP 7052 and applied to contested matters by FRBP 9014(c).

In their objection to confirmation, the petitioners did not identify the specific federal health care legislation "which sets forth a deadline by which a physician-owned hospital must have a Medicare provider agreement in place in order to avail itself of the exception permitting physician ownership of a hospital." Objection to Confirmation of First Amended Plan for the Adjustment of Debts of Valley Health System Dated December 17, 2009 by Save the Hospitals, Inc.; Prime Healthcare Services, Inc.; Albert L. Lewis, Jr.; John Lloyd; and Edward J. Fazekas, 3:7–10. The court notes that a deadline of December 31, 2010 may be applicable under the Health Care and Education Reconciliation Act of 2010, H.R. 4872, 111th Cong. § 1106 (2010) (final version).

the remaining prong of the petitioners' feasibility objection and the merits of the petitioners' claims in the Challenge Actions. Prior to the continued hearing, VHS made four adjustments to the First Amended Plan pursuant to 11 U.S.C. § 942.[44]

**44.** Modification of First Amended Plan for the Adjustment of Debts of Valley Health System Dated December 17, 2009. The plan modification did not require further disclosure nor did it adversely change the treatment of the claims of any creditors other than those who had voluntarily agreed to subordinate their claims on an individualized basis. VHS's First Amended Plan, as modified, henceforth is VHS's Modified First Amended Plan.

**45.** Prior to January 25, 2010, none of the petitioners were creditors of VHS nor did they have any discernable interest in VHS's bankruptcy case other than as a potential purchaser of assets from VHS. VHS had specifically reserved its right to challenge the petitioners' standing to object to its plan prior to commencement of the confirmation hearing on February 9, 2010. *Cf. Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527, 531 (3d Cir.1999) ("Courts that have considered appellate standing in the context of the sale or other disposition of estate assets have generally held that creditors have standing to appeal, but disappointed prospective purchasers do not."); *Simantob v. Claims Prosecutor, LLC (In re Lahijani),* 325 B.R. 282, 290 n. 13 (9th Cir.BAP2005) (stating that "disappointed prospective bidders who are not creditors usually do not have standing to appeal").

The deadline to file objections to confirmation of VHS's First Amended Plan was January 25, 2010. In an apparent effort to preempt any issue concerning standing, Prime purchased a claim in the case. On January 22, 2010, Prime purchased a Proof of Claim filed by B.P. Cabinets, Inc. on July 17, 2008 (Claims Docket #88–1), which evidenced an unsecured non-priority claim in the amount of $4,290 for the replacement of countertops at the Hemet Valley Hospital on or about October 15, 2007. On January 25, 2010, Prime filed a request for issuance of a notice of the transferred claim pursuant to FRBP 3001(e), together with its objection to confirmation of VHS's First Amended Plan.

The court denied VHS's request to overrule the petitioners' remaining feasibility objection

At the continued hearing on February 22, 2010, the court denied VHS's request that the petitioners' remaining confirmation objection be overruled as brought in bad faith[45] and proceeded to consider VHS's evidence regarding the ability of PHH to obtain the funds neces-

as brought in bad faith based upon findings of fact and conclusions of law stated orally and recorded in open court at the hearing on February 22, 2010. The court's findings of fact and conclusions of law are adopted and incorporated herein by reference. In its ruling, the court noted that § 1109(b) states that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue" in a chapter 11 case. 11 U.S.C. § 1109(b). Section 1109(b) is applicable to chapter 9 cases. *See* 11 U.S.C. § 901(a). Save the Hospitals, Inc., Lewis, Lloyd, and Fazekas had no standing to object to confirmation. While it would not have been a stretch to find that Prime—which sought unsuccessfully to purchase the assets of VHS being sold under the Modified First Amended Plan and which purchased the B.P. Cabinets' unsecured claim on the eve of the confirmation hearing for the admitted purpose of obtaining "an interest in the bankruptcy case" so it could object to the plan—did so for an improper purpose, the court noted that "[t]here is no per se rule denying 'party in interest' status to the purchaser of a claim against a [debtor]." *In re Zaleha,* 162 B.R. 309, 313 (Bankr.D.Idaho 1993). Prime did not purchase the claim for the specific purpose of controlling the vote of a class of claims to block confirmation of the plan. *See Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (In re Figter),* 118 F.3d 635, 639 (9th Cir.1997) (observing that courts "have been sensitive to situations where a company, which was not a preexisting creditor, has purchased a claim for the purpose of blocking an action against it."). As the holder of an unsecured claim, Prime's interest in the proceeding is within the zone of interests that Congress intended to protect with respect to the particular issues raised under § 943(b)(7). Finally, whether or not Prime purchased the claim for the sole purpose of permitting it to object to confirmation, the court has an independent obligation to determine that a pro-

sary to consummate the purchase of VHS's assets under the Modified First Amended Plan. On February 23, 2010, the court overruled the petitioners' remaining feasibility objection not tied to the Challenge Actions, finding that VHS's Modified First Amended Plan is feasible under § 943(b)(7) in that it offers a reasonable prospect of success and is workable.[46] The court then considered testimony and evidence regarding the Challenge Actions. At the conclusion of the hearing on February 26, 2010, the matter was taken under submission.

## II. DISCUSSION

■ This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157(a) and 1334(b). The issues before the court involve both core and non-core matters. Confirmation of a plan of adjustment under chapter 9 is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (L), and (O). The Challenge Actions involve the State Law Claims. To the extent that the Challenge Actions are non-core, the parties have stipulated to the jurisdiction of this court to adjudicate the Challenge Actions in conjunction with confirmation.[47] Venue is appropriate in this court. 28 U.S.C. § 1409(a).

A. *VHS's Board of Directors Did Not Violate a Fiduciary Duty by Approving the ASA with an Unconditional "No Shop" Provision*

Petitioners claim that VHS's Board of Directors elected to "disable itself from

even considering better offers for the purchase of its assets by agreeing to an airtight 'no shop' clause in the ASA" and that its decision to do so "violates its fiduciary duties."[48] Section 4.7 of the ASA contains the following provision:

> *No Shop.* Provided that Purchaser is not in material breach or default of this Agreement, for which Seller has provided Purchaser with notice specifying such material breach or default and the reasonable opportunity to cure such material breach or default, Seller shall not, prior to the earlier of the Closing or termination of this Agreement, without the prior written consent of Purchaser: (i) offer for sale, lease or other disposition, the assets of the Hospital Businesses or the Assets (or any portion thereof); (ii) solicit offers or consider unsolicited offers to acquire (by sale, lease or otherwise) all or any material portion of any of the Hospital Businesses or the Assets; (iii) hold discussions with any party (other than Purchaser) looking toward such an offer or solicitation other than to acknowledge receipt; or (iv) enter into any agreement with any party (other than Purchaser) with respect to the sale or other disposition of any of the Hospital Businesses or the Assets.

AR01768. VHS declined to consider an offer from Prime due to the "no shop" clause in the ASA.[49] Petitioners claim that the VHS Board of Directors had a fiduciary

posed plan meets the confirmation requirements of § 943(b), notwithstanding creditor approval. *Mount Carbon*, 242 B.R. at 36.

**46.** The court hereby adopts and incorporates herein by reference its findings of fact and conclusions of law regarding confirmation of VHS's Modified First Amended Plan stated orally and recorded in open court at the continued confirmation hearing on February 23, 2010, pursuant to F.R.Civ.P. 52(a)(1), as in-

corporated into FRBP 7052 and applied to contested matters by FRBP 9014(c).

**47.** *See* Stipulation, *supra* note 39.

**48.** Plaintiffs' Trial Brief, 24:24–26.

**49.** By letter dated August 13, 2009, Prime expressed an interest in purchasing substantially all of the assets of VHS for an unspeci-

duty both to VHS's creditors and the constituents of the health care district to maximize the benefits of any asset sale by considering competing offers. However, the petitioners are unable to identify any statute or case law imposing such a fiduciary duty on directors of a California health care district. Nevertheless, the petitioners argue that the VHS Board of Directors considered itself bound by fiduciary duties, pointing to Hippert's statement at the Board of Directors meeting on July 29, 2009, that the sale of VHS's assets must be considered "if we are to carry out the fiduciary responsibilities each of us pledged to do when we were elected to serve on its Board."[50] VHS, on the other hand, asserts that it was under no statutory or regulatory restriction which precluded it from approving a sale agreement containing a "no shop" provision.

▬ A typical "no shop" clause prohibits a seller from soliciting or considering new or alternative bids for assets subject to an existing asset sale agreement.[51] Outside of bankruptcy, no shop clauses and other lock-up agreements are not *per se* invalid but rather are evaluated on a case by case basis and viewed in the context of the entire negotiated transaction. *See, e.g., Cottle v. Storer Commc'n, Inc.,* 849 F.2d 570, 575 (11th Cir.1988) ("While lock-ups in a takeover situation are not per se illegal, they may be illegal in particular cases."); *Jewel Cos., Inc. v. Pay Less Drug Stores Nw., Inc.,* 741 F.2d 1555, 1562 (9th Cir.1984) (holding that under California law, a corporation's board of directors may enter into an exclusive merger agreement with the board of directors of another corporation pending submission of the agreement to shareholders for approval); *Paramount Commc'ns, Inc. v. QVC Network, Inc.,* 637 A.2d 34, 49 n. 20 (Del.1994) (holding that a no-shop clause, when combined with the sale of control and other protective provisions, was invalid because it prevented the directors "from carrying out their fiduciary duties in considering unsolicited bids or in negotiating for the best value reasonably available to stockholders"); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 176 (Del.1986) ("In our view, lock-ups and related agreements are permitted under Delaware law where their adoption is untainted by director interest or other breaches of fiduciary duty."). Courts apply the business judgment rule[52] to determine whether a corporation's board of directors' decision to adopt a no-shop clause in a particular transaction is fair and reasonable to the corporation and its shareholders. *See, e.g., Cottle,* 849 F.2d at 577

fied amount. AR00386. At the hearing, Prime made an offer of proof that Prime's offer represented a better alternative for VHS's creditors and the public than the ASA.

**50.** AR00026.

**51.** *See generally* George V. Varallo & Srinivas M. Raju, *A Process Based Model for Analyzing Deal Protection Measures,* 55 Bus. Law 1609, 1616–18 (2000).

**52.** California's business judgment rule is codified in California Corporations Code § 309(a), which states:

A director shall perform the duties of a director, including duties as a member of any committee of the board upon which the director may serve, in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.

Cal. Corp.Code § 309(a). "The general purpose of the business judgment rule is to afford directors broad discretion in making corporate decisions and to allow these decisions to be made without judicial second-guessing in hindsight." *F.D.I.C. v. Castetter,* 184 F.3d 1040, 1044 (9th Cir.1999).

("The business judgment rule thus prevents us from second guessing the directors' decision to grant the lock-up."); *Jewel Cos.*, 741 F.2d at 1562 ("In light of California's statutory scheme preserving the board's traditional management function in the case of corporate control transactions, we see no reason to conclude that the drafters of the Corporate Code intended to deprive a corporate board of the authority to agree to refrain from negotiating or accepting competing offers until the shareholders have considered an initial offer."); *Revlon, Inc.*, 506 A.2d at 185 (holding that the board's decision to grant an asset option lock-up with a no-shop provision represented a breach of the directors' duty of care under the circumstances of the case, and was "not entitled to the deference accorded it by the business judgment rule").

In the chapter 11 context, a debtor in possession stands in the shoes of a trustee and is a fiduciary for the estate and its creditors. 11 U.S.C. § 1107(a); *see, e.g., Thompson v. Margen (In re McConville)*, 110 F.3d 47, 50 (9th Cir.1997) (stating that chapter 11 debtors in possession "were fiduciaries of their own estate owing a duty of care and loyalty to the estate's creditors"), *cert. denied*, 522 U.S. 966, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997); *Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*, 839 F.2d 610, 614 (9th Cir.1988) ("As debtor in possession he is the trustee of his own estate and therefore stands in a fiduciary relationship to his creditors.") (footnote omitted); *Devers v. Bank of Sheridan, Montana (In re Devers)*, 759 F.2d 751, 754 (9th Cir.1985) ("A debtor-in-possession has the duty to protect and con-

serve property in his possession for the benefit of creditors.").

■■ When the debtor is a corporation, the debtor in possession's fiduciary obligations to the corporation, its creditors and shareholders, fall upon the officers and directors. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) (stating that "the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession"); *Wolf v. Weinstein*, 372 U.S. 633, 649, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963) (observing that "so long as the Debtor remains in possession, it is clear that the *corporation* bears essentially the same fiduciary obligation to the creditors as does the trustee for the debtor out of possession") (emphasis in original); *Holta v. Zerbetz (In re Anchorage Nautical Tours, Inc.)*, 145 B.R. 637, 643 (9th Cir.BAP1992) ("When the debtor is a corporation, corporate officers and directors are considered to be fiduciaries both to the corporate debtor in possession and to the creditors."). Corporate officers, as fiduciaries, must protect and preserve estate assets held in trust for the benefit of creditors. *Holta*, 145 B.R. at 643; *Hirsch v. Penn. Textile Corp. (In re Centennial Textiles, Inc.)*, 227 B.R. 606, 612 (Bankr.S.D.N.Y. 1998) ("As fiduciaries, the debtor in possession and its managers are obligated to treat all parties to the case fairly, maximize the value of the estate, and protect and conserve the debtor's property.") (internal citations omitted).

Not surprisingly, courts have scrutinized deal protection measures, such as break-up fees,[53] no-shop clauses, and window shop

---

**53.** A break-up fee " 'is an incentive payment to an unsuccessful bidder who placed the estate property in a sales configuration mode . . . to attract other bidders to the auction.' "

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y.1992), *ap-*

provisions,[54] built into asset sales for which approval is sought by a chapter 11 debtor in possession under § 363. *See, e.g., In re Reliant Energy Channelview LP,* 594 F.3d 200, 210 (3d Cir.2010) (holding that "[t]he Bankruptcy Court did not abuse its discretion when it concluded that an award of a break-up fee was not necessary to preserve the value of the estate"); *O'Brien Envtl. Energy, Inc.,* 181 F.3d at 535 (stating that it is permissible to offer a break-up fee and reimbursement of expenses to induce an initial bid, provided the allowance of the fee is necessary to preserve the value of the estate and does not give an advantage to a favored purchaser over other bidders by increasing the cost of acquisition); *Integrated Res., Inc.,* 147 B.R. at 664 (upholding bankruptcy court's decision to approve an agreement negotiated by a disinterested board of directors after discussions with 30 potential bidders and before the debtors selected a purchaser and agreed to a break-up fee and window shop provision). In *Pacificorp Ky. Energy Corp. v. Big Rivers Elec. Corp. (In re Big Rivers Elec. Corp.),* 233 B.R. 739 (W.D.Ky. 1998), a district court held that a chapter 11 debtor in possession could not enter into an agreement with a "no shop" clause,

preventing the debtor from actively soliciting or entertaining competing offers with other entities. *Id.* at 752. The bankruptcy court had ruled that the agreement violated public policy because the "no shop" clause interfered with the debtor's fiduciary obligation to maximize the estate's value. *In re Big Rivers Elec. Corp.,* 233 B.R. 726, 736 (Bankr.W.D.Ky.1998). The district court affirmed on this issue, noting that "[t]his prohibition violates the underlying policy of the Bankruptcy Code to maximize the value of the estate for the creditors by stifling the bidding process for the assets of the debtor." *Big Rivers Elec. Corp.,* 233 B.R. at 753.

■■■ Unlike chapter 11, there is no concept of a debtor in possession in chapter 9.[55] Section 541, which defines "property of the estate," is not incorporated into chapter 9.[56] Nor is § 363, which regulates the use, sale or lease of property, applicable to a chapter 9 case. *See* 11 U.S.C. § 901(a). By virtue of § 904, a debtor in chapter 9 retains title to, possession of, and complete control over its property and its operations, and is not restricted in its ability to sell, use, or lease its property.[57]

---

*peal dism'd,* 3 F.3d 49 (2d Cir.1993) (citation omitted).

**54.** "A window shop clause is a promise not to solicit a later, better offer, but which permits a board to look at such an offer, provide information to the offeror, and, under appropriate circumstances, accept the offer. *Id.* at 655.

**55.** The term " 'trustee', when used in a section that is made applicable to a case under [chapter 9] by section 103(e) or 901 ..., means debtor, except as provided in section 926...." 11 U.S.C. § 902(5).

**56.** 11 U.S.C. § 901(a). The term " 'property of the estate', when used in a section that is made applicable in a case under [chapter 9] by section 103(e) or 901 ..., means property of the debtor." 11 U.S.C. § 902(1).

**57.** Section 904 states:

Notwithstanding any power of the court, unless the debtor consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, *interfere* with—

(1) any of the political or governmental powers of the debtor;

(2) any of the property or revenues of the debtor; or

(3) the debtor's use or enjoyment of any income-producing property.

11 U.S.C. § 904 (emphasis added). Section 105(a) is not applicable to chapter 9 cases. 11 U.S.C. § 901(a). To the extent that the court has power to issue certain orders under a specific provision of the Code incorporated into chapter 9, that authority is equally limited by § 904.

▮▮▮ VHS is neither a chapter 11 debtor in possession nor a corporation. VHS is a California health care district in chapter 9. VHS exists by virtue of the LHCDL, and its powers are enumerated in California Health & Safety Code § 32121. VHS is authorized by statute "[t]o transfer, at fair market value, any part of its assets to one or more nonprofit corporations to operate and maintain the assets." Cal. Health & Safety Code § 32121(p)(1). There is nothing in § 32121 nor any other section of the LHCDL imposing fiduciary obligations on the board of directors of a local hospital district.[58] Furthermore, § 32121(p)(1), by its terms, does not require competitive bidding.

▮▮▮ Competitive bidding in California is governed by statute. *Wilson v. L.A. County Metro. Transp. Auth.*, 23 Cal.4th 305, 313, 96 Cal.Rptr.2d 747, 1 P.3d 63 (2000). No public entity in California is bound to engage in competitive bidding absent a statutory mandate to do so. *Constr. Indus. Force Account Council v. Amador Water Agency*, 71 Cal.App.4th 810, 815, 84 Cal.Rptr.2d 139 (1999). "While there are 'powerful purposes served by competitive bidding [*e.g.*, pre-venting waste, favoritism, and corruption], there is no all-pervasive public policy that requires all public entities to engage in that practice. Rather, the Legislature imposes competitive bidding requirements on public entities within its purview when the Legislature determines it is in the public interest to do so.' " *Id.* (quoting *San Diego Serv. Auth. for Freeway Emergencies v. Superior Court*, 198 Cal.App.3d 1466, 1469, 244 Cal.Rptr. 440 (1988)).

When the California legislature intends to require competitive bidding, it knows how to draft legislation to accomplish that result. *See, e.g.*, Cal. Health & Safety Code § 32319(a) ("The board of directors may sell the bonds pursuant to the resolution ... [b]y giving notice inviting sealed bids and selling to the highest responsible bidder."); Cal. Health & Safety Code § 32311 ("At the time appointed, the board of directors shall open the proposals, and may sell the bonds or any portion thereof to the highest responsible bidder or bidders."); Cal. Gov't Code § 43627 ("Before selling the bonds, or any part thereof, the legislative body shall give notice inviting sealed bids in such a manner as the legislative body may prescribe. If satisfactory bids are received, the bonds offered for sale

---

**58.** Arguably, the VHS directors as public officials each bear the same fiduciary relationship towards their constituents as a "trustee bears to his *cestui que trust*, and should therefore act with the utmost good faith." *See Hobbs, Wall & Co. v. Moran*, 109 Cal.App. 316, 319, 293 P. 145 (1930). " 'A public office is a public trust created in the interest and for the benefit of the people. Public officers are obligated ... to discharge their responsibilities with integrity and fidelity.... [T]hey may not exploit or prostitute their official position for their private benefits. When public officials are influenced in the performance of their public duties by base and improper considerations of personal advantage, they violate their oath of office and vitiate the trust reposed in them, and the public is injured by being deprived of their loyalty and honest services. It is therefore the general policy of this state that public officers shall not have a personal interest in any contract made in their official capacity.' " *Breakzone Billiards v. City of Torrance*, 81 Cal.App.4th 1205, 1232, 97 Cal.Rptr.2d 467 (2000) (quoting *Terry v. Bender*, 143 Cal.App.2d 198, 206, 300 P.2d 119 (1956)). Section 1090 of the California Government Code was enacted for the specific purpose of "ferreting out any financial conflicts of interest, other than remote or minimal ones, that might impair public officials from discharging their fiduciary duties with undivided loyalty and allegiance to the public entities they are obligated to serve." *Lexin v. Superior Court*, 47 Cal.4th 1050, 1073, 103 Cal.Rptr.3d 767, 222 P.3d 214 (2010).

shall be awarded to the highest responsible bidder."); Cal. Pub. Res.Code § 5790.7(b) ("The board of directors shall award the sale of bonds to the highest responsible bidder."); Cal. Educ.Code § 15148 ("If satisfactory bids are received, the bonds offered for sale shall be awarded to the highest responsible bidder or bidders...."); Cal. Harb. & Nav.Code § 72(b) ("At the time and place fixed in the notice, the legislative body shall meet and consider all bids that have been submitted. The lease shall be awarded to the highest responsible bidder...."). The fact that California Health & Safety Code § 32121(p)(1) is silent with respect to competitive bidding must be accorded meaning, particularly given the unambiguous language of the statute. *Cf. Gozlon–Peretz v. United States*, 498 U.S. 395, 404, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991) (" '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' ") (quoting *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983); *Progressive West Ins. Co. v. Preciado*, 479 F.3d 1014, 1018 (9th Cir.2007)) (" 'Faced with statutory silence ..., we presume that Congress is aware of the legal context in which it is legislating.' ") (quoting *Abrego v. Dow Chem. Co.*, 443 F.3d 676, 683–84 (9th Cir.2006) (per curiam).

The VHS Board of Directors must exercise the authority granted under California Health & Safety Code § 32121 in the public interest.[59] Its decisions may be reviewed by writ of mandate and set aside for abuse of discretion. Cal.Civ.Proc.Code § 1094.5. Directors are subject to civil and criminal liability for contracts made by them in their official capacity in which they hold a personal or financial interest. Cal. Gov't Code §§ 1090, 1097. They can be removed for willful or corrupt misconduct in office. *Id.* § 3060. Any contract approved by the board of directors that is tainted by a conflict of interest may be declared void. *Id.* § 1092(a). But the petitioners have failed to establish that the VHS Board of Directors in approving the ASA with a "no-shop" provision either breached a specific fiduciary duty imposed by law or violated any statutory obligation to submit the proposed sale of assets to a competitive bidding process.

B. *No Member of VHS's Board of Directors Who Voted to Approve the ASA Was "Financially Interested" in the Contract in Violation of California Government Code § 1090*

Petitioners accuse Cherry, Dreier, and Rao, three of VHS's seven directors, of public corruption.[60] Petitioners charge that PHH is, in fact, a front for Chaudhuri, an influential physician who lives and works in Riverside County, and that Cherry, Dreier, and Rao violated the public trust by approving the ASA in their official capacities in violation of California Government Code § 1090 primarily to line the pockets of Chaudhuri and professional corporations in which Chaudhuri owns an interest. To establish that each of these directors has an impermissible "financial interest" in the ASA in violation of § 1090, the petitioners ask the court to draw inferences from evidence of a web of business relationships and personal contacts involving Cherry, Dreier, Rao, and these

---

**59.** *See supra* note 58.

**60.** Petitioners do not allege that Hippert, O'Donnell, Holmes, or Wilson were financially interested in the ASA at the time it was approved by VHS or that they otherwise engaged in conduct in violation of California Government Code § 1090.

professional corporations. In particular, the petitioners point out that some of these professional corporations have filed proofs of claim against VHS.[61] As part of the consideration for the purchase of VHS's assets, PHH agreed to assume liability for certain claims and to indemnify and hold VHS harmless for the payment of such claims.[62] Petitioners maintain that Cherry, Dreier, and Rao each had a conflict of interest when they voted to approve the ASA notwithstanding a business relationship with one or more of these claimants. VHS does not materially dispute the connections traced by the petitioners, but denies the inferences made by the petitioners and argues that the interest, if any, of each of the targeted directors under the circumstances of this case is too remote and speculative to constitute a prohibited conflict of interest under California Government Code § 1090.

Section 1090 of the California Government Code states that:

Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. Nor shall state, county, district, judicial district, and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity.

As used in this article, "district" means any agency of the state formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries.

Cal. Gov't Code § 1090. Section 1090 "codifies the long-standing common law rule that barred public officials from being personally financially interested in the contracts they formed in their official capacities." *Lexin,* 47 Cal.4th at 1072, 103 Cal. Rptr.3d 767, 222 P.3d 214; *See BreakZone Billiards,* 81 Cal.App.4th at 1230, 97 Cal. Rptr.2d 467 (stating that "[t]he purpose of this section is to prohibit self-dealing" by

---

**61.** The proofs of claim include: (1) Claim # 134–1 filed by HCMG in an "unknown" amount on August 22, 2008, based upon an alleged breach of a Risk Sharing Agreement between the Hemet Hospital and HCMG dated December 29, 1994; (2) Claim # 135–1 filed by LHIO in an "unknown" amount on August 22, 2008, based upon an alleged breach of an Information Technology Services Agreement between LHIO and VHS dated May 22, 2006; (3) Claim # 136–1 filed by HCMG in an "unknown" amount on August 22, 2008, based upon an alleged breach of a Risk Sharing Cooperation and Support Agreement between VHS and HCMG dated March 27, 2006; and (4) Claim # 168–1 filed by Menifee Valley Community Medical Group, Inc. in an "unknown" amount on August 22, 2008, based upon an alleged breach of a Risk Sharing Cooperation and Support Agreement between VHS and Menifee Valley Community Medical Group, Inc. dated March 27, 2006.

**62.** Section 1.2.1 **Purchaser's Estimate of Purchase Consideration** states, in pertinent part:

"(v) *Assumed Rejection Claims.* The satisfaction or assumption by Purchaser of, and the full and complete release of Seller from any liability under, the rejection and/or breach claims filed by KM Strategic Management, Inc. ("KM"), Hemet Community Medical Group ("HCMG"), Menifee Valley Community Medical Group ("MVCMG"), LHIO, LLC ("LHIO"), and any claims of constituent members thereof which are derivative from such rejection and/or breach claims of KM, HCMG, MVCMG or LHIO, which Purchaser contends constitutes an assumption and release of claims worth approximately $55,000,000 ("Assumed Rejection Claims") as detailed more fully in claim numbers 134, 135, 136, and 168 and any amendments thereto, and indemnifying, defending and holding Seller harmless with respect to the Assumed Rejection Claims;...." AR01732–AR01733.

public officials); *Thomson v. Call*, 38 Cal.3d 633, 645, 214 Cal.Rptr. 139, 699 P.2d 316 (1985) ("[T]he policy goals of section 1090 support the rule that public officers 'are denied the right to make contracts in their official capacity with themselves or *to become interested in contracts thus made.*'") (quoting *Stockton P. & S. Co. v. Wheeler*, 68 Cal.App. 592, 602, 229 P. 1020 (1924)) (emphasis in original).

 To establish a violation of § 1090, the plaintiff must establish that (1) the defendant government official or employee participated in an official capacity in the making of a contract; (2) the defendant had a cognizable financial interest in the contract; and (3) if raised as an affirmative defense, that the cognizable financial interest does not fall within the exceptions set forth in either California Government Code § 1091 or § 1091.5.[63] *Lexin*, 47 Cal.4th at 1074, 103 Cal.Rptr.3d 767, 222 P.3d 214. "[A]n official has a financial interest in a contract if he might profit from it." *People v. Honig*, 48 Cal. App.4th 289, 333, 55 Cal.Rptr.2d 555 (1996). Section 1090 is construed liberally to embrace both direct and indirect financial interests.[64] *See, e.g., Breakzone Billiards*, 81 Cal.App.4th at 1230, 97 Cal. Rptr.2d 467 ("This statutory prong of the conflict of interest doctrine requires that the official have some interest in the outcome, whether direct or indirect."); *Honig*, 48 Cal.App.4th at 323, 55 Cal.Rptr.2d 555 ("This section has long been interpreted as prohibiting an official from having any financial interest in a contract, whether direct or indirect."); *Terry v. Bender*, 143 Cal.App.2d 198, 208, 300 P.2d 119 (1956) ("The fact that [the public official's] interest might be small or indirect is immaterial so long as it is such as deprives the [public] of his overriding fidelity to it and places him in the compromising situation where, in the exercise of his official judgment or discretion, he may be influenced by personal considerations rather than the public good."). "Where the interest is remote and speculative, no conflict of interest is held to be present under the statute." *Breakzone Billiards*, 81 Cal. App.4th at 1230, 97 Cal.Rptr.2d 467. A contract made in violation of § 1090 is void. *See, e.g., Lexin*, 47 Cal.4th at 1073, 103 Cal.Rptr.3d 767, 222 P.3d 214 ("Where a prohibited interest is found, the affected contract is void from its inception."); *Thomson*, 38 Cal.3d at 646 n. 15, 214 Cal. Rptr. 139, 699 P.2d 316 ("California courts have generally held that a contract in which a public officer is interested is void, not merely voidable.") (emphasis in original).

**63.** VHS asserts that neither Cherry, Dreier, or Rao possess a cognizable financial interest in the ASA. Therefore, VHS has not alleged a defense under either California Government Code §§ 1091 or 1091.5.

**64.** Courts have approved the following jury instruction for use in prosecuting criminal violations of §§ 1090 and 1097:

The phrase "financially interested" as used in Government Code section 1090 means any financial interest which might interfere with a state officer's unqualified devotion to his public duty. The interest may be direct or indirect. It includes any monetary or proprietary benefit, or gain of any sort or the contingent possibility of monetary or proprietary benefits. The interest is direct when the state officer, in his official capacity, does business with himself in his private capacity. The interest is indirect when the state officer, or agency he directs, enters into a contract in his or its official capacity with an individual or entity, which individual or entity, by reason of the state officer's relationship to the individual or entity at the time the contract is entered into, is in a position to render actual or potential pecuniary benefits directly or indirectly to the state officer based on the contract the individual or entity has received.

*Honig*, 48 Cal.App.4th at 322–23, 55 Cal. Rptr.2d 555.

■ California courts have long recognized that an impermissible conflict of interest arises when a public official on behalf of a public entity participates in making a contract with another entity at which the public official is employed or in which the public official owns an interest. *See, e.g., Miller v. City of Martinez*, 28 Cal.App.2d 364, 368, 82 P.2d 519 (1938); *Hobbs, Wall & Co.*, 109 Cal.App. at 321, 293 P. at 148; *Stockton Plumbing & Supply Co. v. Wheeler*, 68 Cal.App. 592, 602, 229 P. 1020 (1924). Petitioners rely on this line of cases as authority for their charge of public corruption against Cherry, Rao, and Dreier. However, these cases are inapposite.

In *Stockton Plumbing & Supply Co. v. Wheeler*, Charlesworth, a city councilman, was employed as a sheet metal foreman at Stockton Plumbing and Supply Company ("Stockton Plumbing"). *Stockton Plumbing & Supply Co.*, 68 Cal.App. at 595, 229 P. 1020. The City of Stockton planned to build a memorial civic auditorium. *Id.* at 594, 229 P. 1020. Stockton Plumbing was the lowest responsible bidder for the performance of plumbing, heating, and ventilating work on the project. *Id.* at 595, 229 P. 1020. Charlesworth, as a member of the "Building Committee" of the city council, supervised a revision of plans for the new auditorium, but was not present at the city council meeting at which the construction contract was awarded. *Id.* The sole question was whether Charlesworth was "interested" in the contract. *Id.* at 600, 229 P. 1020. In holding that the contract was void due to Charlesworth's conflict of interest, the court stated:

> In this case Charlesworth was the sheet metal foreman of the petitioner's establishment and the contract proposed to be awarded to petitioner was connected directly with that department of the petitioner's business. Under these circumstances, it would be exceedingly strange

if Charlesworth were not to a considerable extent desirous of the awarding of the contract to his employer.... While it may truly be said that he would not derive direct pecuniary gain from the contract, he certainly would indirectly be so benefited, since upon the success of petitioner's business financially primarily depends the continued tenure of his position and the compensation which he receives for performing the service required of him as the foreman of the department referred to.

*Id.* at 602, 229 P. 1020.

In *Hobbs, Wall & Co.*, Dressler, a city councilman, was employed as manager of Hobbs, Wall & Co., which had sold goods to the city for $249.66. Dressler "was not a stockholder in the corporation and had no direct pecuniary interest in it." *Hobbs, Wall & Co.*, 109 Cal.App. at 317, 293 P. 145. The city council, including Dressler, voted to pay the claims. J.J. Moran ("Moran"), the city treasurer, refused to pay the warrants issued and presented for payment of the claims. *Id.* Hobbs, Wall & Co. sought a writ of mandate to compel Moran to pay the warrants. *Id.* The trial court denied the writ, holding that "Dressler, as the manager of the business from which the supplies were purchased, was indirectly interested in the transaction, and that it was therefore illegal." *Id.* The court of appeal affirmed the judgment, stating that "Dressler, as manager, had such an interest in his employer's mercantile business as to preclude him from participating, as a member of the council, in the allowance of the claims." *Id.* at 321, 293 P. 145.

In *Miller v. City of Martinez*, Severns, a city councilman, was employed by Shell Oil Company ("Shell") as manager of its Martinez office. *Miller*, 28 Cal.App.2d at 365–66, 82 P.2d 519. Severns also owned

shares of stock in Shell. *Id.* at 366, 82 P.2d 519. The city council, including Severns, voted to approve payment of Shell's claims for petroleum products and other merchandise purchased by the city and ordered warrants drawn on the city treasury for payment of the sum of $4,639.89. *Id.* Miller, a taxpayer and resident of the City of Martinez, filed suit to recover the amounts paid alleging that the claims were void due to Severns' conflict of interest. *Id.* at 365, 82 P.2d 519. The trial court entered judgment for the defendants, holding that the complaint failed to state a cause of action. *Id.* The court of appeal reversed, stating that "[c]ases are numerous in which it has been held that one who is an employee of another, or a corporation or firm, and at the same time a member of the city council of a municipality is ineligible as such official to make or assist in making a contract with the person or corporation in whose employment he is, and that a contract so made is void upon the principle that such act would contravene public policy." *Id.* at 368, 82 P.2d 519.

In this case, PHH is a Delaware corporation qualified to do business in California.[65] PHH's sole shareholder is PHH, LLC, a Delaware limited liability company qualified to do business in California. PHH, LLC is managed by an Executive Committee and a Managing Member. Chaudhuri is the Managing Member of PHH, LLC.[66] Neither Cherry, Dreier, or Rao are employees of PHH or PHH, LLC nor do they own an interest in either PHH or PHH, LLC.

The court agrees with VHS and PHH that the case of *Hotchkiss v. Moran,* 109 Cal.App. 321, 293 P. 148 (1930), which is the companion case of *Hobbs, Wall & Co.,* is more directly in point. In that case, Hotchkiss Electric Light Company ("Hotchkiss Electric") sold electricity to Crescent City and was owed the sum of $305.82. *Hotchkiss,* 109 Cal.App. at 323, 293 P. 148. J.M. Hotchkiss ("Hotchkiss"), the president of Hotchkiss Electric, was also a stockholder in Hobbs, Wall & Company. *Id.* at 322, 293 P. 148. Dressler, who was employed as a manager of Hobbs, Wall & Company, was a member of the Crescent City council and chairman of the finance committee. *Id.* at 322–23, 293 P. 148. Dressler was not a stockholder in Hobbs, Wall & Company nor a stockholder or employee of Hotchkiss Electric. *Id.* at 322, 293 P. 148. The city council, including Dressler, voted to pay the claim of Hotchkiss Electric. *Id.* at 323, 293 P. 148. Moran, the city treasurer, refused to pay the warrants issued and presented for payment of the claim. *Id.* Hotchkiss sought a writ of mandate, and the trial court ordered a writ of mandate to issue directing Moran to pay the warrants. *Id.* The court of appeal affirmed, holding that "Dressler was not employed with or interested in the

---

65. *See supra* note 6.

66. To fund a portion of the purchase of VHS's assets by PHH under the ASA, PHH, LLC intends to undertake a legally compliant, exempt private offering to local community physicians who are accredited investors utilizing a private placement memorandum "Subscription Process." The primary investors will be local community physicians on the medical staffs of Hemet Hospital and Menifee Hospital. At the closing of the sale of assets by VHS to PHH, investors in PHH, LLC will receive ownership interests in PHH in proportion to the amount invested. Until this syndication is completed, it is unknown what percentage any particular investor will have in PHH or PHH, LLC. At the confirmation hearing on February 22, 2010, the court determined that PHH would have the $56,150,000 needed to meet its obligations under the ASA. However, Chaudhuri has agreed to invest, loan, or contribute funds necessary to permit PHH to meet its obligations on the Sale Closing Date under the ASA to the extent PHH's offerings are insufficient to fund the transaction.

electric lighting company, directly or indirectly." *Id.* In so holding, the court stated:

> It may not reasonably be said a contract for lighting a city violates the Municipal Corporation Act merely because the councilman who participates in the transaction is the manager of a mercantile business in which a prominent stockholder of the electric company is also a stockholder. The interest of the councilman under such circumstances is too remote and speculative upon which to assume the contract will be thereby affected.

*Id.*; *see Breakzone Billiards,* 81 Cal. App.4th at 1230–31, 97 Cal.Rptr.2d 467 ("Where the interest is remote and speculative, no conflict of interest is held to be presented under the statute. This has been the rule since *Hotchkiss v. Moran* . . . .").

Petitioners presented extensive evidence at trial of contractual or employment relationships between Cherry, Rao, and Dreier's husband, Dr. Ralph G. Dreier, M.D. ("Dr. Dreier") and professional corporations in which Chaudhuri is an officer, director, or shareholder. But whether any of these connections place Cherry, Rao, or Dreier in a position to receive, directly or indirectly, an actual or pecuniary benefit *based on the contract with PHH* is, at best, remote and speculative.

### 1. *Chaudhuri and Related Entities*

In addition to serving as the Managing Member of PHH, LLC, Chaudhuri is an officer, director, or shareholder in each of the following professional corporations that provide medical services to Riverside County: HCMG; Menifee Valley Community Medical Group, Inc. (the "Menifee Medical Group"); Temecula Valley Physicians Medical Group, Inc. (the "Temecula Medical Group"); Devonshire Surgical Medical Group, Inc. ("Devonshire"); and Hemet Healthcare Surgery Center, Inc. ("Hemet Surgery").

HCMG is a California professional corporation which operates as an independent physicians association ("IPA"). HCMG contracts to provide medical care to health maintenance organization ("HMO") enrollees residing in Hemet, San Jacinto, Sun City, Menifee, Lake Elsinore, Wildomar, Canyon Lake, Corona, Temecula, Murrieta, Idyllwild, Anza, and the surrounding unincorporated areas of Riverside County. HCMG is co-owned by approximately 45 physicians. Chaudhuri is Chairman of the Board of Directors of HCMG and owns a 38% interest in the corporation. Chaudhuri has authority to terminate an HCMG contract with any physician, subject to approval of HCMG's board of directors. Six of the initial investors in PHH, who collectively have committed to invest in excess of $20 million in PHH, own 9% of the equity in HCMG. Another 15 of the 49 physicians who have issued checks for $1,000 to PHH, other than Chaudhuri, collectively own 23% of the equity in HCMG. HCMG, however, is not an investor in PHH or PHH, LLC.

The Menifee Medical Group is a California professional corporation and a HCMG group provider, operating as an IPA that accesses health plan contracts through HCMG for HMO enrollees in the Menifee/Sun City area. Chaudhuri is the Chairman of the Board of Directors and CEO of Menifee Medical Group. Chaudhuri has authority to terminate Menifee Medical Group's contract with any physician, subject to approval of Menifee Medical Group's board of directors. Chaudhuri is also the sole shareholder of the Menifee Medical Group. The Menifee Medical Group is not an investor in PHH or PHH, LLC.

The Temecula Medical Group is a California professional corporation and a HCMG group provider, operating as an IPA that accesses health plan contracts through HCMG for HMO enrollees in Temecula, Lake Elsinore, Canyon Lake, Wildomar, Murrieta, and the surrounding unincorporated areas of Riverside County. Chaudhuri is the Chairman of the Board of Directors of Temecula Medical Group. Chaudhuri has authority to terminate Temecula Medical Group's contract with any physician, subject to approval of Temecula Medical Group's board of directors. Chaudhuri is also the majority (90%) shareholder of the Temecula Medical Group. Temecula Medical Group is not an investor in PHH or PHH, LLC.

Devonshire is a surgical group comprised of independent contractor surgeons which provide general, vascular and thoracic services to HCMG and its group provider, Menifee Medical Group. Chaudhuri is a one-third minority shareholder of Devonshire. David Sizemore, M.D. ("Sizemore") is President of Devonshire. Chaudhuri is not an officer of the corporation. However, Devonshire is managed by KM Strategic Management, LLC ("KM"), which is owned by Chaudhuri and Mike Foutz. While each of the principals of KM are committed to invest in PHH, Devonshire is not an investor in PHH or PHH, LLC.

Hemet Surgery is a California professional corporation that operates an ambulatory surgery facility in Hemet. Hemet Surgery contracts directly with HMOs, PPOs, Medicare, MediCal, private insurers, and individuals to provide outpatient surgical services in the Hemet, San Jacinto, Menifee, and Sun City areas. Hemet Surgery does not contract directly with HCMG. Hemet Surgery is co-owned by six physicians, including Chaudhuri. Chaudhuri is a member of the board of directors of Hemet Surgery. At all times relevant to this case, Kuan Chen, M.D. ("Chen") has served as the President of Hemet Surgery. Chen, Chaudhuri, and Sizemore are on Hemet Surgery's board of directors. Hemet Surgery is not an investor in PHH or PHH, LLC.

### 2. Cherry

Petitioners contend that "PHH, by virtue of being controlled by the same group of individuals responsible, directly or indirectly, for virtually all of Cherry's salary paid by Temecula Medical Group and [HCMG], is in a position to render pecuniary benefits to Cherry based on the contract (i.e., the ASA) it received."[67] Petitioners seek a finding that "Cherry had a conflict of interest because he voted to approve the ASA that will compromise a claim of his employer and benefit the Chairman of his employer."[68]

Cherry is a physician who has served as a member of VHS's Board of Directors since November 2002. Cherry conducts a private practice in the Menifee/Temecula area through William H. Cherry, M.D., Inc., a wholly-owned professional corporation. Cherry's practice includes providing services for HMOs. Cherry provides primary health care services to health plan enrollees of HCMG pursuant to a Primary Care Professional Service Agreement effective April 1, 2002.[69] He is one of 125 primary care physicians, 900 specialists

---

67. Plaintiffs' Trial Brief, 10:20–23.

68. Petitioners' Proposed Findings of Fact and Conclusions of Law, 18:16–18.

69. Section 8.1 entitled "Immediate Termination" authorizes HCMG to terminate the contract immediately if the physician engages in "conduct or activity which substantially jeopardizes the Group's business reputation." Exhibit 100, Cherry 00073.

and 7,500 providers who have agreements with HCMG. The contract with HCMG permits Cherry to access the HMO network for his HMO patients. Cherry currently has 11,040 patient records. Cherry also provides primary care services for HCMG's group provider, Temecula Medical Group, in the Temecula area pursuant to an IPA Primary Care Physician Provider Agreement dated June 1, 2004.[70] Cherry accesses a network of medical specialists for his patients through his independent provider agreement with the Temecula Medical Group. He provides these services through William H. Cherry, Inc. and Same Day Medical Care, Inc. For services provided to HMO enrollees, Cherry is compensated through a per member per month capitation fee via a relationship between HCMG and insurance companies. Finally, Cherry is one of fifteen Medical Directors for HCMG pursuant to a Medical Director Agreement with HCMG dated August 1, 2005.[71] Cherry serves as a medical director on behalf of HCMG over the geographic service area of Menifee Medical Group. Cherry's compensation as a medical di-

rector has not changed since the inception of the contract.

At the time the ASA was approved by VHS, Cherry was an independent contractor of Temecula Medical Group and HCMG. Cherry has been an outspoken critic of Chaudhuri, notwithstanding the non-disparagement clauses contained in his contracts with HCMG and Temecula Medical Group. There is no credible evidence that Cherry was unduly influenced by Chaudhuri by virtue of his contractual relationships with HCMG and Temecula Medical Group. Nor is there evidence that Chaudhuri or any other individual either directed Cherry to vote in favor of the ASA or promised consideration to Cherry in exchange for a favorable vote on the ASA. Cherry is not an investor in PHH or PHH, LLC and has no cognizable financial interest in the ASA, PHH or PHH, LLC.[72]

### 3. *Rao*

■■ Rao has served as a member of VHS's Board of Directors since December 2008. Rao is employed by Hemet Surgery as its Administrator. He is an "at will"

---

**70.** Section 6.15 entitled "Disparagement" states: "PCP shall refrain from making or publishing disparaging statements concerning the Company, its directors, officers, shareholders and providers and the Company's management ... and its directors, officers, employees and shareholders." Exhibit 102, Cherry 00007. Section 12.2(c) entitled "Immediate Termination by Company" further states, in pertinent part, that the Company may immediately terminate the contract upon written notice if the PCP has "made or published disparaging remarks about the Company." Exhibit 102, Cherry 00013.

**71.** Section 1.4 of the contract entitled "Public Support for Group / No Disparagement" states: "Physician shall at all times publicly and privately support the Group, its directors, officers and representatives." Exhibit 103, Cherry 00025. Section 3.2 entitled "Termi-

nation by Group" authorizes termination of the physician for cause upon 30 days written notice and without cause upon 90 days written notice to the physician. Exhibit 103, Cherry 00026.

**72.** Indeed, Cherry submitted a statement under penalty of perjury to VHS dated July 20, 2009, stating, in pertinent part, that he "will not own any stock or invest in either PHH or any other entity which proposes to purchase any assets of Valley Health System;" that he has "no desire to own any stock or to invest in either PHH or any other entity which proposes to enter into a joint venture with Valley Health System;" and that he "will not be an officer, director, partner, manager, or employee of any entity which chooses to either purchase the assets or enter into a joint venture with Valley Health System." Exhibit 244:1

employee of Hemet Surgery. Petitioners assert that "PHH, by virtue of being controlled by the same group of individuals responsible for Rao's continued employment, salary and bonus at Hemet Surgery, is in a position to render pecuniary benefits to Rao based on the contract (i.e., the ASA) it received."[73] Petitioners seek a finding that Rao had an impermissible conflict of interest under California Government Code § 1090 when he voted to approve the ASA "because he knew that Chaudhuri, the former CEO and significant shareholder of his sole employer, stood to benefit from the assumption of the Assumed Rejection Claims, and from ownership and control of PHH."[74]

Chaudhuri is one of 6 minority shareholders of Hemet Surgery. Hemet Surgery contracts directly with HMOs. The HMOs refer their patients directly to Hemet Surgery for outpatient surgery services. Hemet Surgery does not contract with HCMG. Rao is not an investor in PHH or PHH LLC, and has no direct or indirect financial interest in the ASA, PHH, or PHH, LLC. There is no evidence that Chaudhuri or any other individual either directed Rao to vote in favor of the ASA or promised consideration to Rao in exchange for a favorable vote on the ASA. Nor is there credible evidence that Rao was unduly influenced by Chaudhuri due to his employment as Administrator of Hemet Surgery. Chaudhuri is an investor in Hemet Surgery, but does not exercise any operational control over Hemet Surgery and does not hold any management position.

### 4. *Dreier*

■ Dreier has served as a member of VHS's Board of Directors since June 2009. Petitioners ask the court to find that Dreier had an impermissible conflict of interest under California Government Code § 1090 when she voted to approve the ASA because her husband, Dr. Dreier, a local general surgeon, provides services to Devonshire pursuant to a contract that authorizes Devonshire to terminate the agreement if Dr. Dreier makes disparaging remarks about HCMG or KM.[75] Dreier is not employed by Devonshire, HCMG, or any of the other entities in which Chaudhuri is an officer, director or shareholder.[76] Given her husband's contract with Devonshire, however, the petitioners reason that "PHH, by virtue of being controlled by the same group of individuals responsible for Mrs. Dreier's salary, is in a position to render pecuniary benefits to Mrs. Dreier based on the contract (i.e., the ASA) it received."[77]

Dr. Dreier is a respected surgeon with over 40 years of surgical experience in the Hemet area. On June 1, 2004, Dr. Dreier agreed to provide Devonshire surgical services on a nonexclusive basis pursuant to a Physician Services Agreement dated June 1, 2004.[78] Devonshire paid Dr. Dreier

---

73. Plaintiffs' Trial Brief, 11:14–16.

74. Petitioners' Proposed Findings of Fact and Conclusions of Law, 29:5–7.

75. Petitioners' Proposed Findings of Fact and Conclusions of Law, 22:18–20.

76. Dr. Dreier submitted a statement under penalty of perjury to VHS dated July 22, 2009, in conjunction with his spouse's appointment to the VHS Board of Directors confirming that he "would not be an owner,

director or officer of PHH" and that he was "willing to forgo any involvement in PHH" to permit her to serve on the board of directors. Exhibit 246:1.

77. Plaintiffs' Trial Brief, 9:16–18.

78. Section 11 entitled "No Disparagement" states: "The parties recognize that the success of the Group depends upon sound and mutual supportive relationship with HCMG, its management company, its Board of Di-

$20,000 per month for services provided under this contract. Dr. Dreier's contract with Devonshire was executed more than five years prior to his wife accepting a position on the VHS Board of Directors. Prior to June 1, 2004, Dr. Dreier had a contract to provide surgical services to HCMG members through the Hemet Surgeons' Group, Inc. Dr. Dreier was paid $20,000 per month for his services under his employment agreement with Hemet Surgeons' Group, Inc. Dr. Dreier's compensation under his contract with Devonshire was increased to $25,000 per month in 2007 based upon patient encounter data[79] which established that additional compensation was warranted given the number of surgeries performed by Dr. Dreier. Neither Dreier nor her husband, Dr. Dreier, own an equity interest in Devonshire.

At the time the ASA was approved by VHS, Dr. Dreier was an independent contractor of Devonshire. Dreier and her husband are not investors in PHH or PHH, LLC. Neither Dreier or her husband possess a direct or indirect financial interest in the ASA, PHH, or PHH, LLC. There is no evidence that Chaudhuri or any other individual either directed Dreier to vote in favor of the ASA or promised consideration to Dreier or her husband, Dr. Dreier, in exchange for a favorable vote on the ASA. Nor is there credible evidence that Dreier was unduly influenced by Chaudhuri due to her husband's contractual relationship with Devonshire. Chaudhuri is an investor in Devonshire, but does not exercise any operational control over Devonshire and is not an officer of the company. The fact that Dr. Dreier has not publicly criticized Devonshire, HCMG, or Chaudhuri in the past five years does not support a finding that either he or his spouse has a cognizable financial interest in the ASA.

▪ Because the petitioners have failed to establish that either Cherry, Rao, or Dreier had a cognizable financial interest in the ASA at the time it was approved by VHS's Board of Directors, the petitioners' challenge pursuant to California Government Code § 1090 will be dismissed.[80]

---

rectors, Officers, and representatives. Accordingly, Physician agrees that he shall not make disparaging remarks regarding HCMG, its directors, officers, representatives, or its subcontracted management company, KM Strategic Management, LLC or its directors, officers, employees or representatives and shall endeavor at all times to be supportive of the aforesaid entities and persons. Group likewise agrees that it shall make no disparaging remarks regarding Physician and it shall, at all times, endeavor to be supportive of Physician." Exhibit 24, Dreier 0003.

79. See Exhibit 245.

80. Had the ASA been tainted by the vote of directors "financially interested" in the transaction in violation of § 1090, VHS and PHH reason that the election on December 15, 2009, at which voters approved the proposed sale of VHS's assets to PHH by a wide margin, would have *validated* the otherwise void contract, citing *City of San Diego v. Furgatch*, 2002 WL 1575109 (Cal.App.4th Dist.). The court disagrees. *Furgatch* and its progeny stand for the proposition that "void municipal contracts that are fully within the powers of the public entity may be effectively ratified if done so in the manner prescribed for the making of the contract." *Id.* at *12; *see Los Angeles Dredging Co. v. Long Beach*, 210 Cal. 348, 359–60, 291 P. 839 (1930). In *Furgatch*, a city council member who was financially interested in certain contracts approved by the city council resigned her office due to allegations of misconduct. A newly composed city council adopted "ordinances designed to reexecute and readopt the alleged ineffective contracts previously consummated." *Furgatch*, 2002 WL 1575109, at *12. The city then filed an in rem action to validate the ratification ordinances pursuant to California Code of Civil Procedure § 860, *et seq. Id.* at *1. The trial court granted summary judgment for the city and the court of appeals affirmed, holding that summary judgment

### C. The PHH Transaction Provides "Fair Value" for VHS's Assets

Petitioners' charge that V & IG was not "independent" and that its Fair Consideration Opinion was not rendered "in accordance with applicable governmental and industry standards for appraisal and valuation" as required by California Health & Safety Code § 32121(p)(1).[81] Petitioners allege specifically that:

> V & IG ... understood that their job was to justify the bargain basement price to be paid by [Chaudhuri], and they initially came in with appraised values that were so low that they surprised VHS's General Counsel, John Marshall ("Marshall"). Marshall instructed VHS to prepare higher values and to use those higher values in their appraisals; in violation of the applicable independence rules, V & IG followed his orders. Indeed, Marshall himself drafted the text of key passages in V & IG's fair consideration opinion, and V & IG accepted his text without question. Notably, V & IG also failed to value many of the assets being transferred to PHH, made fundamental errors in valuing the assets it did appraise, and made no effort at all to determine the present value of consideration to be paid by PHH under the ASA.

Plaintiff's Trial Brief, 2:5–14. Petitioners believe that, as a result, VHS is receiving less than "fair value" for the assets to be sold to PHH. VHS counters that V & IG is a qualified, independent valuator which properly appraised VHS's assets by applying accepted industry and governmental standards of valuation to reach its conclusion that VHS is receiving fair and reasonable consideration for the assets being transferred under the ASA.

Section 32121(p)(1) of the California Health & Safety Code authorizes VHS, as a local health care district:

> To transfer, at fair market value, any part of its assets to one or more non-profit corporations to operate and maintain the assets. A transfer pursuant to this paragraph shall be deemed to be at fair market value if an independent consultant, with expertise in methods of appraisal and valuation and in accordance with applicable governmental and industry standards for appraisal and valuation, determines that fair and reasonable consideration is to be received by the district for the transferred district assets. Before the district transfers, pursuant to this paragraph, 50 percent or more of the district's assets to one or more nonprofit corporations, in sum or by increment, the elected board shall, by resolution, submit to the voters of the district a measure proposing the transfer. The measure shall be placed on the ballot of a special election held upon the request of the district or the ballot of the next regularly scheduled election occurring at least 88 days after the resolution of the board. If a majority of the voters voting on the measure vote in its favor, the transfer shall be approved. The campaign disclosure requirements applicable to local measures provided under Chapter 4 (commencing with Section 84100) of Title 9 of the Government Code shall apply to this election.

---

was proper because as a matter of law, void contracts under sections 1090 and 1092 ... can be legally ratified." *Id.* It was ratification by the a city council free of conflicts of interest, not the election, that breathed new life into the otherwise void contracts.

**81.** Petitioners do not dispute the fact that V & IG has expertise in methods of appraisal and valuation and is otherwise qualified to render an opinion regarding fair market value for purposes of California Health & Safety Code § 32121(p)(1). *See supra* note 23.

Cal. Health & Safety Code § 32121(p)(1) (emphasis added). Section 32121(p)(1) authorizes VHS to transfer its assets to PHH, a non-profit corporation, for the purpose of operating and maintaining the assets, so long as it does so at fair market value. *Id.* An appraisal or professional opinion as to value is not a condition for a transfer of assets under § 32121(p)(1). *Id.* However, a transfer under § 32121(p)(1) is *deemed* at fair market value if "an independent consultant, with expertise in methods of appraisal and valuation and in accordance with applicable governmental and industry standards for appraisal and valuation, determines that fair and reasonable consideration is to be received by the district" for the assets. *Id.*

1. *V & IG Was an Independent Consultant*

 Petitioners assert that V & IG was not independent, claiming that (a) V & IG was instructed by Marshall to assign high values in its appraisals of VHS's assets; and (b) V & IG accepted without inquiry text prepared by Marshall for V & IG's Fair Consideration Opinion describing the assets to be transferred and concluding that fair value was to be received by VHS for the assets under the ASA.

(a) *Scope of Work*

The Scope of Work Rule set forth in the Uniform Standards of Professional Appraisal Practice ("USPAP") states:

For each appraisal, appraisal review, and appraisal consulting assignment, an appraiser must:

1. identify the problem to be solved;

2. determine and perform the scope of work necessary to develop credible assignment results; and

3. disclose the scope of work in the report.

An appraiser must properly identify the problem to be solved in order to determine the appropriate scope of work. The appraiser must be prepared to demonstrate that the scope of work is sufficient to produce credible results.

Exhibit 124:22. With regard to *Problem Identification,* the Scope of Work further states:

An appraiser must gather and analyze information about those assignment elements that are necessary to properly identify the appraisal, appraisal review or appraisal consulting problem to be solved.

*Id.* In the comment to "Problem Identification," USPAP provides the following guidance for an appraiser:

In an appraisal assignment, for example, identification of the problem to be solved requires the appraiser to identify the following assignment elements:

* client and any other intended users;

* intended use of the appraiser's opinions and conclusions;

* type and definition of value;

* effective date of the appraiser's opinions and conclusions;

* subject of the assignment and its relevant characteristics; and

* assignment conditions

This information provides the appraiser with the basis for determining the type and extent of research and analyses to include in the development of an appraisal. Similar information is necessary for problem identification in appraisal review and appraisal consulting assignments.

*Communication with the client is required to establish most of the information necessary for problem identification. However, the identification of relevant characteristics is a judgment*

*made by the appraiser that requires competency in that type of assignment.* *Id.* (emphasis added). Finally, USPAP's *Scope of Work Acceptability* requirement provides, in pertinent part, that "[a]n appraiser must not allow the intended use of an assignment or a client's objectives to cause the assignment results to be biased." *Id.* at 23. Jean–Pierre Lomonaco ("Lomonaco"),[82] who performed the appraisals for VHS on behalf of V & IG, testified that it is consistent with USPAP to speak to the client about the property to be appraised and to accept direction from a client regarding the scope of the work to be performed.

On July 3, 2009, Marc Lussier ("Lussier"), Chief Executive Officer of V & IG, emailed to Marshall, at Marshall's request, a proposed engagement letter for appraisal of the Hemet Hospital, Menifee Hospital, Menifee—Adjacent Vacant Parcels, Skilled Nursing Facility, Hemet Valley Medical Arts Building, and the Five Accessory Buildings. After July 3, 2009, Marshall and Lussier communicated through a series of emails regarding the language of the engagement letter and scope of the work

to be performed by V & IG. Marshall asked that one or more spelling errors be corrected, the signature block for VHS revised, and the tense of a word used in the draft engagement letter changed from singular to plural. Marshall also proposed language to expand the description of "Other Hemet Assets" used in the letter, as well as the following language regarding the purpose of the appraisal:

> Purpose: The purpose should be to 'determine the market value of the facilities for (a) internal planning, (b) bankruptcy purposes, and (c) possible sale of some or all of such assets.' I would then add at the end of that paragraph: Sale of fifty percent or more of the District's assets will require that such transfer be at fair market value and an opinion that the proposed transaction will receive fair and reasonable consideration, pursuant to Section 32121(p) of the California Local Health Care District Law.

Exhibit 71:3. Marshall's suggestions were incorporated into the final draft of the engagement letter between VHS and V & IG dated July 9, 2009, which was accepted by VHS on July 13, 2009.[83]

---

**82.** Lomonaco is the President of V & IG, Culver City, California. He is a member of the Appraisal Institute ("MAI"), and a certified general real estate appraiser licensed in Arizona, California, Colorado, Georgia, Illinois, Maryland, Massachusetts, Michigan, Ohio, Oregon, Pennsylvania, Texas, Utah, and Washington. He graduated from the University of Southern California with a Bachelor of Science degree in Finance with an emphasis on real estate. According to his resume, Lomonaco's "[e]xperience includes appraisal and marketing feasibility assignments for a wide range of property types in the senior housing and healthcare related industry. Property types included senior apartments, independent living, congregage, assisted living, skilled nursing, Alzheimer's, medical office buildings, surgery centers, dialysis centers, rehabilitation hospitals, psychiatric hospitals, speciality hospitals, and general acute care hospitals. Assignments

have been conducted throughout the United States." Exhibit 3A:18. Lomonaco oversaw the preparation of all of the appraisals underlying the Fair Consideration Opinion and was qualified to sign the Fair Consideration Opinion.

**83.** Exhibit 9:2. The engagement letter signed by the parties states, in pertinent part:

> "The purpose of the appraisal is to determine the market value of the facilities for (a) internal planning, (b) bankruptcy purposes and (c) and possible sale of some or all of such assets; therefore the value conclusion will be market value and will be in compliance with USPAP and FIRREA standards. We understand that a Sale of fifty percent or more of the District's assets will require that such transfer be at fair market value and an opinion that the proposed transaction will receive fair and reasonable

Lussier worked with Marshall to identify the scope and purpose of the appraisals to be undertaken by V & IG for VHS, as permitted by USPAP's Scope of Work Rule. There is nothing in the testimony of either Lussier or Marshall nor the documentary evidence to support a finding that Marshall's clarification concerning the purpose of the appraisals in the engagement letter prevented V & IG from developing credible assignment results or affected the scope of work's acceptability by causing "the assignment results to be biased."[84] Nor does the evidentiary record support a finding that V & IG, from the outset, understood its "job was to justify the bargain basement price to be paid by" PHH, Chaudhuri, or any other potential purchaser of VHS's assets, as alleged by petitioners.

(b) *Marshall Did Not Instruct V & IG to Produce an Appraisal Containing a Predetermined Opinion or Conclusion*

The *Conduct* section of USPAP's Ethics Rule states, in pertinent part, that:

An appraiser must perform assignments ethically and competently, in accordance with USPAP. . . .

An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests. . . .

An appraiser must not accept an assignment that includes the reporting of *predetermined opinions and conclusions.*
Exhibit 124:17.

By email dated August 7, 2009, Marshall asked Lussier if he was ready to "discuss preliminary numbers on the appraisal, and particularly Hemet."[85] In response, Lussier emailed Marshall a "Schedule of Pre-

liminary Value Conclusions" later that day.[86] Marshall testified he told Lussier that "VHS had entered into an exclusivity agreement with PHH, but that no number had been proposed by PHH" for the purchase of its assets and that "he needed to have [V & IG's] preliminary numbers so when an offer came in, [VHS] would know whether it was in the ballpark or not." Marshall further testified that he advised Lussier by telephone that the numbers seemed low and asked Lussier: "Are you able to give me a range between the low number you considered and the high number you considered so that if, as, and when we get an offer from PHH we could evaluate that offer in terms of the appraisal range." Lussier testified that he told Marshall the preliminary values were liquidation numbers. Marshall testified that he did not recall any discussion on August 7, 2009, regarding liquidation.

On August 10, 2009, Lussier emailed Marshall a "Schedule of Preliminary Value Conclusions" containing the following range of value for each of the properties being appraised by V & IG for VHS:

| Property | Low Value | High Value |
|---|---|---|
| Hemet Hospital | $19,270,000 | $28,530,000 |
| Menifee Hospital | $20,330,000 | $26,110,000 |
| Menifee Parcels | $ 4,570,000 | $ 6,830,000 |
| Skilled Nursing Facility | $ 3,800,000 | $ 4,450,000 |
| Medical Arts Building | $ 7,340,000 | $ 8,810,000 |
| Accessory Buildings | $ 2,730,000 | $ 3,410,000 |

Exhibit 77:2. In conjunction with the range of values transmitted by Lussier, Marshall did not recall whether Lussier referred to the low values as "liquidation" values or the high values as "going concern" values. Lussier's accompanying email to Marshall states: "This analysis has not considered a value in Liqui-

consideration, pursuant to Section 32121(p) of the California Local Health Care District Law."

84. *See* Exhibit 124:23.

85. Exhibit 75.

86. Exhibit 76:2.

dation."[87] Marshall denies that he directed Lussier or anyone at V & IG to "come up" with a higher number for VHS's assets.

Lomonaco formulated the range of values given by V & IG to Marshall on August 10, 2009. Lomonaco testified that it was typical to prepare a range of low and high values for a client depending on the scope of the assignment. Lomonaco acknowledged, however, that it would be inappropriate for the client to determine whether to issue an appraisal at the low end or the high end of that range.

On or about September 4, 2009, V & IG delivered to Marshall a box containing a draft of an appraisal prepared by Lomonaco for each of the properties. Lomonaco valued the Menifee Parcels at the "high value," and the Skilled Nursing Facility, Medical Arts Building, and Accessory Buildings just under the "high value" of the range of values previously provided by Lussier to Marshall on August 10, 2009. Only the draft appraisals of Hemet Hospital and Menifee Hospital carried a value in the lower range of those V & IG had provided to Marshall on August 10, 2009. Lomonaco testified that he did not have a conversation with Marshall or anyone at VHS regarding the drafts. Lomonaco's testimony was consistent with that of Marshall, who testified that he did not have any further contact with V & IG until the end of the month.

On September 30, 2009, Marshall advised Lussier by email that VHS was "on a fast track" and that VHS might "need (a)

final appraisals with the high values (or perhaps with the ranges) and (b) opinion per Health Care District Law, by Monday."[88] Marshall does not deny sending the email and Lussier does not deny receiving the email. However, Lussier testified that Marshall did not, at any time, ask V & IG to assign a specific number for the valuation of Hemet Hospital or Menifee Hospital or otherwise suggest a value for the assets being appraised by V & IG for VHS. Lomonaco did not recall any contact with VHS, including Marshall, before completing the appraisals on October 5, 2009, nor did he recall any conversations with Lussier regarding Marshall's email dated September 30, 2009. When pressed on cross examination about his email dated September 30, 2009, Marshall testified that Lussier responded to the email by providing "the number that he [Lussier] was comfortable using in connection with this transaction."

On October 5, 2009, V & IG delivered a final appraisal on each of the properties to VHS which contained the following values:

| Property | Final Appraised Value |
| --- | --- |
| Hemet Hospital | $27,830,000 |
| Menifee Hospital | $25,800,000 |
| Menifee Parcels | $ 6,830,000 |
| Skilled Nursing Facility | $ 4,550,000 |
| Medical Arts Building | $ 8,700,000 |
| Accessory Buildings | $ 3,300,000 |

*See supra* notes 24–29.

### (1) *Final Appraisal of Hemet Hospital*

In its final appraisal, V & IG used the Income Capitalization Approach[89] to calcu-

---

87. *Id.* at 1.

88. Exhibit 32.

89. "The Income Capitalization Approach involves an estimate of a property's capacity to produce income. This method involves estimating market rent for the subject property, typical vacancy and credit loss rates and expenses. From this, an estimate of the net operating income can be generated. There are two primary methods to value the income stream of a property, one is the Direct Capitalization Method that capitalizes the net operating income by a single rate derived from the market. The second method is a Discounted Cash Flow Analysis which projects the income and expense streams for a specified holding period. The ultimate reversion

late Hemet Hospital's total net revenue at $120,802,500, or $1,638 per adjusted patient day, and its total expenses at $112,677,263, or $1,528 per adjusted patient day, resulting in earnings before the deduction of interest, income taxes, depreciation and amortization ("EBITDA") of $8,135,238.[90] V & IG then determined that a 16% capitalization rate for Hemet Hospital was appropriate "[b]ased on [V & IG's] knowledge of the subject's financial history, the EBITDA trends and future prospects for the subject and the demand for acute-care beds in the subject's market area."[91] V & IG calculated the net as-is value of Hemet Hospital at $27,330,000 by applying the 16% capitalization rate to EBITDA to arrive at a value indication of $50,850,000, and then deducting $23,520,000 for estimated earthquake retrofit costs to comply with SB 1953.[92]

V & IG arrived at the same net as-is value of $27,330,000 for Hemet Hospital using the Sales Comparison Approach.[93] V & IG compared the EBITDA multiple of four companies which it considered to have a reasonable degree of comparability with Hemet Hospital—Community Health Systems, Health Management Associates, Inc., Universal Health Services, and Lifepoint Hospitals. V & IG observed that "a multiplier in the range of 4 to 8 times EBITDA is considered reasonable by most of the investor-owned chains."[94] Based upon its analysis of Hemet Hospital's revenue under the Income Capitalization Approach and its finding that it had a stabilized EBITDA of $8,135,238, V & IG determined that Hemet Hospital's gross value, before deduction of SB 1953 costs, "would be reasonably represented by an EBITDA multiple of 6.25."[95] V & IG calculated the net as-is value of Hemet Hospital at $27,330,000 by applying a multiplier of 6.25 to EBITDA to arrive at a value indication of $50,850,000, and then deducting $23,520,000 for estimated earthquake retrofit costs to comply with SB 1953.

V & IG's final valuation of Hemet Hospital at $27,830,000 represented an increase in excess of a $9 million from the value set forth in its draft appraisal dated September 4, 2009.[96] The increased value is directly attributable to two changes: (a) an increase in the EBITDA multiplier from 5 to 6.5; and (b) a reduction in the capitalization rate from 20% to 16%.[97]

*(2) Final Appraisal of Menifee Hospital*

V & IG used the Income Capitalization Approach in its final appraisal of Men-

---

from the sale of the property at the end of the holding period is also considered." Exhibit 3A:84.

90. *Id.* at 112.

91. *Id.* at 113.

92. *Id.* at 113–14.

93. "The Sales Comparison Approach involves a search for recent sales and current listings of comparable properties and an analysis of the selected data as they relate to the subject. The two indicators of value employed in this approach are the price per bed and the earnings before interest, taxes, depreciation and amortization multipliers (EBITDA). In valu-

ing hospitals, the most common unit of comparison is the EBITDA. The first method is based on selecting an EBITDA multiplier, which is derived from the market data, and multiplying it by the subject's estimated EBITDA. The second method, price per bed, is used as a check of reasonableness. Based upon these two techniques, an estimate of value via the Sales Comparison Approach is determined." *Id.* at 84.

94. *Id.*

95. *Id.* at 99.

96. *See* Exhibit 81:2.

97. *Compare* Exhibit 81:12 *with* Exhibit 3A:14.

ifee Hospital to calculate Menifee Hospital's total net revenue at $46,280,000, or $1,780 per adjusted patient day, and its total expenses at $42,111,800, or $1,620 per adjusted patient day, resulting in EBITDA of $4,168,200. V & IG used the same 16% capitalization rate applied to Hemet Hospital. V & IG then calculated the net as-is value of Menifee Hospital at $25,800,000 by applying the 16% capitalization rate to EBITDA to arrive at a value indication of $26,050,000, and then deducting $250,000 for estimated earthquake retrofit costs to comply with SB 1953.[98]

V & IG arrived at the same net as-is value of $25,800,000 for Menifee Hospital using the Sales Comparison Approach. Based upon its analysis of Menifee Hospital's revenue under the Income Capitalization Approach and its determination that it had a stabilized EBITDA of $4,168,200, V & IG calculated the net as-is value of Menifee Hospital at $25,800,000 by applying a 6.25 multiplier to EBITDA to arrive at a value indication of $26,050,000 and deducting $250,000 for estimated earthquake retrofit costs.

With respect to Menifee Hospital, V & IG used an EBITDA multiplier of 6.25 and a 16% capitalization rate in both its draft appraisal and final appraisal. However, V & IG's final valuation of Menifee Hospital at $25,800,000 represented an increase of $5.4 million from the value set forth in its draft appraisal dated August 21, 2009.[99] The difference was attributable to a reduction in the management fee from 8.5% to 6.5% of net revenue, the capitalization of which produced an increase in value of $5,470,000.[100]

Lomonaco testified that he was familiar with USPAP and that he followed USPAP in conducting V & IG's appraisal of each of the six assets for VHS. Lomonaco admitted that he did work to increase the values between the draft appraisals and the final appraisals, testifying that he took another look at the historical operations of the hospitals and compared those to what a typical market participant would expect. Lomonaco testified that a typical management fee for a hospital like Menifee Hospital "was in the neighborhood of 2% to 4%" and that a high management fee was indicative of "some overlap in ownership and control between the hospital and the management company."[101] With regard to the EBITDA multiplier, Lomonaco testified that he determined the appropriate multiplier after considering a number of factors, including diversification risks and industry surveys that were documented in the appraisal. Lomonaco further testified that he reconsidered his SB 1953 analysis between the draft and final appraisals. Because of a change in attitude among market participants regarding SB 1953 retrofit costs since the initial regulations were enacted following the Northridge earthquake, Lomonaco concluded that he had applied too conservative and stringent a method with respect the SB 1953 issues facing the Hemet Hospital. On reconsideration, Lomonaco determined that a 16% capitalization rate for Hemet Hospital was reasonable.

### (3) *Fair Consideration Opinion*

On October 5, 2009, Marshall emailed Lussier a copy of the ASA for the purpose

---

**98.** *Id.* at 113–14.

**99.** *See* Exhibit 82:2.

**100.** *Compare* Exhibit 3B:110 *with* Exhibit 82:110

**101.** Lomonaco observed in his final appraisal of Menifee Hospital: "The district's operations are managed by Valley Health Care Management Services, which is 50% owned by the district and 50% owned by a physician owner." Exhibit 3B:65.

of permitting Lussier to review the assets to be sold and consideration to be received by VHS from PHH.[102] Marshall testified that he discussed with Lussier each of the elements under § 1.2.1 of the ASA, entitled "Purchaser's Estimate of Purchase Consideration." [103] Marshall testified that he had provided Lussier with the financial statements for VHS for the period ending August 31, 2009, which changed the consideration in the ASA from $156,000,000 to $169,773,000. Marshall testified on cross-examination, however, that he did not recall whether he discussed with Lussier that the payments under § 1.2.1(a)(iv) and (ix) were over a period of years.

On October 5, 2009, Lussier emailed Marshall a draft of V & IG's Fair Consideration Opinion. On October 6, 2009, Marshall provided Lussier with proposed language for the consideration description on page 1 of the Fair Consideration Opinion, i.e., "approximately $169[.]773 million, including the assumption of approximately $55 million in disputed claims." [104] Marshall also provided Lussier with a proposed description of assets included in the transaction based on his discussions with Lussier of the ASA—assets which were either subsumed in the appraisals performed by V & IG or disclosed in VHS's financial statements.[105] Marshall testified that he also discussed with Lussier proposed language for a reference to VHS's financial statements under paragraph (f) on page 4, together with suggested language for the bullet point on page 5 of the Fair Consideration Opinion.[106] Several drafts of the Fair Consideration Opinion were exchanged between Lussier and Marshall. Notwithstanding the proposed language, Marshall testified that he did not instruct Lussier to either include specific language in the Fair Consideration Opinion or make a particular conclusion in the Fair Consideration Opinion. Marshall testified that Lussier never told him that he would have to do some additional work to determine if the assets in the description provided by Marshall were covered by an appraisal or the financial statements.

Lomonaco testified that he exercised independent judgment in reaching the conclusions set forth in each of V & IG's final appraisals, that the appraisals were prepared in a manner consistent with USPAP, and that the value stated in each of the final appraisals is an accurate statement of the value of the asset appraised on the date of valuation. Petitioners do not quarrel with V & IG's appraisals of the Menifee Parcels, Skilled Nursing Facility, Medical Arts Building, or the Accessory Buildings which formed a basis for the Fair Consideration Opinion and resulted in valuations either at or just under the "high value" of the range of values provided by Lussier to Marshall on August 10, 2009. Petitioners do not suggest that V & IG used an inappropriate valuation approach in its appraisal of either Hemet Hospital or Menifee Hospital. Nor do petitioners attack the 6.5 EBITDA multiplier or 16% capitalization rate as applied to Menifee Hospital. Petitioner's argument boils down to a disagreement with Lomonaco's adjustment of the EBITDA multiplier and capitalization rate to 6.5 and 16%, respectively, as applied to Hemet Hospital and reduction of the management fee at Menifee Hospital. There is no credible evidence, however, that Lomonaco was improperly influenced

102. Exhibit 96.

103. *Id.* at 15.

104. Exhibit 97:3.

105. *Id.* at 4.

106. *Id.* at 7.

by Marshall or anyone at VHS in making those determinations.

Had VHS's sale of assets to PHH had been a "sweetheart deal" as claimed by petitioners, VHS would likely have accepted the preliminary numbers received by Marshall on August 7, 2009. Instead, VHS took action to maximize the value of the assets being transferred under the ASA by encouraging V & IG to consider a range of values and other factors affecting the market value of the properties. In doing so, VHS and V & IG did not run afoul of USPAP. In sum, petitioners have not establish by a preponderance of the evidence that V & IG was not independent for purposes of California Health & Safety Code § 32121(p)(1).

### 2. *V & IG Did Not Fail to Follow Accepted Industry and Governmental Standards*

Petitioners claim that V & IG failed to adhere to applicable standards by, among other things, using incorrect stock price data, making arithmetic errors, and failing to value, test or make appropriate inquiry concerning the Assumed Rejection Claims,[107] VHS's accounts receivable and other assets.

USPAP Standard 9 defines the parameters for appraising an interest in an ongoing business. Standards Rule 9–1 states:

In developing an appraisal of an interest in a business enterprise or intangible asset, an appraiser must: (a) be aware of, understand, and correctly employ those recognized approaches, methods and procedures that are necessary to produce a credible appraisal; (b) not commit a substantial error of omission or commission that significantly affects an appraisal; and (c) not render appraisal services in a careless or negligent

manner, such as by making a series of errors that, although individually might not significantly affect the results of an appraisal, in the aggregate affect the credibility of those results.

Exhibit 124:78. Standards Rule 9–5 further states:

In developing an appraisal of an interest in a business enterprise or intangible asset, an appraiser must: (a) reconcile the quality and quantity of data available and analyzed within the approaches, methods, and procedures used; and (b) reconcile the applicability and relevance of the approaches, methods and procedures used to arrive at value conclusion(s).

*Id.* at 81. The comment to Standards Rule 9–5 explains that "[t]he value conclusion is the result of the appraiser's judgment and not necessarily the result of a mathematical process." *Id.*

USPAP Standard 1, which sets forth the requirements for creating an appraisal of real property, states that "[i]n developing a real property appraisal, an appraiser must identify the problem to be solved, determine the scope of the work necessary to solve the problem, and correctly complete research and analyses necessary to produce a credible appraisal." *Id.* at 25. Standards Rule 1–1 further states:

In developing a real property appraisal, an appraiser must (a) be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal; (b) not commit a substantial error of omission or commission that significantly affects an appraisal; and (c) not render appraisal services in a careless or negligent manner, such as by making a series of errors that, although individually might not significantly affect

---

107. *See supra* notes 60 & 61.

the results of an appraisal, in the aggregate affects the credibility of those results.

*Id.* at 25.

Lomonaco admits using 2009 stock prices with 2008 asset data to derive the EBITDA multiplier necessary to determine a sales comparison value for the Hemet Hospital and Menifee Hospital. Lomonico testified at trial that he intended to use 2008 stock prices with 2008 data, but acknowledged that doing so was an error. Lomonaco pointed out in his testimony, however, that the stock price was not the sole data point used in determining an EBITDA multiplier. The evidence as to whether Lomonaco's admitted error was, in fact, a significant material error was conflicting.

As disclosed in the Fair Consideration Opinion, V & IG did not make an independent determination of the value of a number of assets to be transferred pursuant to the ASA.[108] V & IG did not value VHS's accounts receivable, relying instead on VHS's financial statements for the period ending August 31, 2009.[109] Petitioners argue that the accounts receivable actually transferred under the ASA may include "unbilled" or "unreported" amounts that might not appear on the financial statements.[110] Lussier testified that he did not make an independent determination whether the value of the accounts receivable being transferred by VHS under the ASA was the same as the amount of accounts receivable reflected in the financial statements. There is, however, no evidence of "unbilled" or "unreported" amounts" as of the valuation date that would impact materially the conclusion reached in the Fair Consideration Opinion.

Likewise, V & IG did not undertake an independent appraisal of furniture, fixtures, and equipment to be transferred under the ASA. V & IG's engagement letter states that:

A detailed inventory and valuation of Furniture, Fixtures & Equipment is beyond the scope of this engagement. The value will be incorporated into the appraisal based upon its current net book value.

Exhibit 9:3. Lussier admitted that the furniture, fixtures, and equipment were not valued separately, testifying at trial that those underlying assets were "incorporated into the value of the whole."

Nor did V & IG seek to determine whether a purchaser might be able to negotiate a rate for D & O and E & O tail insurance lower than the amounts set forth in the ASA. For purposes of the Fair Consideration Opinion, Lussier reasoned that there was a value equivalency since both VHS and the purchaser would be under an obligation to maintain D & O and E & O tail insurance. There was no evidence that PHH qualified for D & O insurance or E & O insurance at rates lower than VHS. Lussier admitted that V & IG did not make an independent determina-

---

108. Exhibit 27:5 Paragraph (f) on page 4 of the Fair Consideration Opinion states, in pertinent part, that V & IG "[r]eviewed the financial statements, including income statements, balance sheets and statements of cash flows, for the two months ended August 31, 2009, for VHS, including the Assets and Liabilities to be transferred in the Transaction. V & IG has not made an independent determination of the value of the other assets (cash, accounts receivable, inventories, notes receivable and prepaids) or liabilities (accounts payable, prepetition liabilities, accrued PTO, payroll liabilities, payables to third party payors, workers' compensation and malpractice liability). We assume these amounts to be true and correct as stated in the August 2009 financials."

109. *Id.*

110. *See* Exhibit 96:9.

tion as to whether a lease of real property transferred under the ASA was above or below market value due to the duration of the lease. However, there was no evidence of whether a particular lease being transferred pursuant to the ASA was, in fact, below market nor whether the failure to value such lease should have altered the conclusion reached by V & IG concerning the consideration to be received by VHS under the ASA.

During his testimony at trial, Lomonaco acknowledged that USPAP requires that an appraisal include a present value calculation for consideration to be received in the future. However, V & IG did consider whether it should discount to net present value the Annual Support Grants to be paid to VHS or the Creditors Commitment of $21,000,000 under the ASA.[111]

With respect to the Assumed Rejection Claims, the Fair Consideration Opinion states:

> Likewise, we have not made an independent determination of the valuation of the approximately $55 million in disputed claims, the assumption of which forms part of the purchase price. However, even substantially discounting such claims, the consideration to be received by the District constitutes fair and reasonable consideration for the assets to be transferred.

Exhibit 27:5. Lomonaco testified that he had discussions with Lussier about the final opinion, but that he did not have any discussion with Lussier regarding the above statement in the Fair Consideration Opinion. Nor did Lomonaco recall a discussion with Lussier about running a test calculation under which the Assumed Rejection Claims would be valued at zero for purposes of determining whether the amount of consideration to be paid by the purchaser is worth more than the assets being transferred. Lussier testified that he did not know the nature of the claims or who was asserting the claims. Lussier's testimony as to whether he ran a zero value test to determine the value of the claims was conflicting.

Petitioners argue that V & IG should have assigned no value to the Assumed Rejection Claims in the Fair Consideration Opinion because it did not investigate the claims. According to his testimony at trial, Lussier assumed the Assumed Rejection Claims were worth 10 percent of the stated amount for purposes of the Fair Consideration Opinion. He further testified that he did not discuss his 10 percent conclusion with Lomonaco or Marshall. Lussier testified that, prior to reaching his conclusion, he spoke with Marshall regarding the Assumed Rejection Claims and explained that he was having difficulty valuing the assets. Marshall testified that the Assumed Rejection Claims filed by HCMG and Menifee Medical Group were based upon VHS's termination without cause of certain risk pool agreements pursuant to which the IPAs had been receiving income of $1 million per month. Marshall testified that he discussed each of the Assumed Rejection Claims with Lussier, stating that the LHIO and KM claims were worth "nothing" because they were the "subject of litigation" but that he believed the HCMG and Menifee Medical Group claims were "worth a substantial sum." On cross-examination, Marshall testified that he voiced his opinion to Lussier that the discounted value of the disputed claims was probably more than 10 percent of the total amount of the claims, but that he could not quantify it to a certainty. Lussier testified that he relied on his discussions with Marshall in valuing the Assumed Rejection Claims at 10 per-

111. *Id.* at 15–16.

cent of the stated amount. Marshall testified that he did not direct Lussier to attach a particular value to the Assumed Rejection Claims. Marshall's testimony was consistent with that of Lussier, who testified at trial that Marshall did not give him a specific valuation for the claims.

3. *VHS is Receiving Fair and Reasonable Consideration for the Transferred Assets*

█ V & IG is a nationally recognized health care and financial consulting business composed of licensed and experienced real estate appraisers, financial analysts, and health care professionals. Both VHS and Prime have engaged the professional services of V & IG in the past to resolve health care-related valuation issues. Neither VHS nor Prime disputes V & IG's expertise in methods of appraisal and valuation and qualifications to render an opinion regarding fair market value for purposes of California Health & Safety Code § 32121(p)(1). VHS is authorized by statute to transfer its assets to a non-profit corporation for the purpose of operating and maintaining the assets, so long as it does so at fair market value. Cal. Health & Safety Code § 32121(p)(1). At the request of VHS, V & IG appraised the Hemet Hospital, Menifee Hospital, Menifee Parcels, Skilled Nursing Facility, and Medical Arts Building, reviewed the ASA, and issued its Fair Consideration Opinion concluding that fair and reasonable consideration is to be received by VHS for the assets being transferred to PHH under the ASA. A transfer under § 32121(p)(1) is *deemed* at fair market value if "an independent consultant, with expertise in methods of appraisal and valuation and in accordance with applicable governmental

and industry standards for appraisal and valuation, determines that fair and reasonable consideration is to be received by the district" for the assets. *Id.*

V & IG acknowledges that mistakes were made. V & IG admittedly made errors in conducting the appraisals of Hemet Hospital and Menifee Hospital. V & IG could have been more thorough in the analysis that preceded its Fair Consideration Opinion. However, diving a value conclusion, as stated in USPAP, is not simply a mathematical calculation.[112] It is "the result of the appraiser's judgment." [113] V & IG reconciled "the quality and quantity of data available and analyzed within the approaches, methods, and procedures used; and ... [reconciled] the applicability and relevance of the approaches, methods, and procedures used to arrive at value conclusions." [114] Petitioners do not quarrel with V & IG's appraisals of the Menifee Parcels, Skilled Nursing Facility, Medical Arts Building, or the Accessory Buildings, nor the bulk of the conclusions reached by V & IG in its appraisals of Hemet Hospital and Menifee Hospital. Petitioners disagree with V & IG's adjustment of the EBITDA multiplier and capitalization rate to 6.5 and 16%, respectively, as applied to Hemet Hospital and reduction of the management fee at Menifee Hospital. However, the weight of the evidence supports a finding that Lomonaco exercised independent judgment in reaching those conclusions based on his analysis of the data available and in accordance with USPAP. In the court's view, the errors or omissions identified by the petitioners, either individually or in the aggregate, do not significantly affect the results or credibility of an appraisal by V & IG or the integrity of its Fair Consideration Opinion.

---

**112.** *Id.* at 81.

**113.** *Id.*

**114.** *See* Exhibit 124:81.

V & IG determined that fair and reasonable consideration is to be received by VHS from PHH under the ASA "in accordance with applicable governmental and industry standards for appraisal and valuation" as required by § 32121(p)(1). The weight of the evidence does not support a finding that VHS either prevented V & IG from developing credible assignment results or instructed V & IG to produce either an appraisal or the Fair Consideration Opinion with a predetermined opinion or conclusion. There is no evidence that anyone by or on behalf of PHH communicated with anyone at V & IG, including Lussier or Lomonaco, regarding the appraisals or the Fair Consideration Opinion. Petitioners do not challenge in this proceeding VHS's compliance with the campaign disclosure requirements incorporated into § 32121(p)(1). Finally, the court is compelled to give deference to the fact that the transaction was approved by VHS's constituents at an election by an overwhelming majority of the voters, as required by § 32121(p)(1).

Accordingly, the court finds that the consideration to be received by VHS from PHH for the assets to be transferred pursuant to the ASA constitutes fair and reasonable consideration for the transferred assets as required by California Health & Safety Code § 32121(p)(1). The petitioner's challenge under California Health & Safety Code § 32121(p)(1) will be dismissed.

### D. VHS Did Not Violate CEQA in Connection with the PHH Transaction

■ Petitioners assert that VHS's proposed sale of assets to PHH is a "project" within the scope of CEQA,[115] and that "VHS failed to comply with CEQA [because] it sold substantially all of its assets to PHH without conducting any environmental review whatsoever."[116] They argue that the sale may cause a reasonably foreseeable indirect physical change in the environment in violation of CEQA because there is "[e]very indication in the record that PHH intends to develop" the vacant parcels of land adjacent to Menifee Hospital "with medical office buildings and hospital-supporting uses."[117] VHS and PHH maintain that CEQA was not violated, pointing to the 1,822–page administrative record that preceded the VHS Board of Directors' approval of the ASA and arguing there is no evidence that PHH ever submitted any specific plan or proposal to VHS to develop the vacant parcels. VHS and PHH argue that the proposed sale of assets contemplated by the ASA is not a "project" subject to CEQA nor is there any credible evidence to support the conclusion that VHS's approval of the ASA would result in direct or reasonably foreseeable indirect physical change to the environment. VHS and PHH further argue that the petitioners not only lack standing to challenge the ASA under CEQA, but are barred from asserting a challenge due to their failure to exhaust administrative remedies.

### 1. Lewis, Lloyd, and Fazekas Have Standing to Bring the CEQA Mandamus Action

■ Standing is a jurisdictional issue that may be raised at any time during

---

115. "Project," as defined in CEQA, includes "an activity directly undertaken by a public agency" "which may cause either a direct physical change in the environment or a reasonably foreseeable indirect physical change in the environment." Cal. Pub. Res.Code § 21065(a).

116. Plaintiffs' Trial Brief, 20:8–10.

117. Id., 20:25–27.

the proceedings. *See Common Cause v. Board of Supervisors,* 49 Cal.3d 432, 438–39, 261 Cal.Rptr. 574, 777 P.2d 610 (1989). In cases under CEQA, standing requirements are liberally construed. *Save the Plastic Bag Coalition v. City of Manhattan Beach,* 181 Cal.App.4th 521, 2010 WL 298001, *7 (2010).

■■■■ Prime, Lewis, Lloyd, and Fazekas filed a petition for a writ of mandate to invalidate VHS's decision to approve the ASA as a violation of CEQA. A writ of mandate may be issued only upon the verified petition of a "beneficially interested" party. Cal.Civ.Proc.Code § 1086. To establish a beneficial interest, the petitioner must have "some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large." *Carsten v. Psychology Examining Comm.,* 27 Cal.3d 793, 796, 166 Cal.Rptr. 844, 614 P.2d 276 (1980). "This standard is applicable to proceedings in administrative mandate, and it applies in actions based upon CEQA." *Waste Mgmt. of Alameda County, Inc. v. County of Alameda,* 79 Cal.App.4th 1223, 1232–33, 94 Cal. Rptr.2d 740 (2000) (internal citation omitted). There is, however, a public right/duty exception to the beneficial interest standard. *See Bozung v. Local Agency Formation Comm.,* 13 Cal.3d 263, 272, 118 Cal.Rptr. 249, 529 P.2d 1017 (1975) (finding that "plaintiffs have standing 'to procure enforcement of a public duty, …' ") (citation omitted); *Save the Plastic Bag Coalition,* at *9 (concluding that "plaintiff has standing to seek a writ of mandate pursuant to the public right/duty exception to the beneficial interest requirement").

In paragraph 10 of their complaint, Prime, Lewis, Lloyd, and Fazekas state: "All Petitioners have a beneficial interest in the subject matter of this Petition and will be adversely affected by the potential environmental impacts of the approval of the ASA." It is undisputed that Lewis, Lloyd, and Fazekas are residents of Riverside County, California, and each reside in communities within the geographic boundaries served by the VHS district. "Such allegations are sufficient to satisfy the liberal standing requirements for private individuals acting in the public interest to institute proceedings to enforce the provisions of CEQA." *Kane v. Redevelopment Agency,* 179 Cal.App.3d 899, 904, 224 Cal. Rptr. 922 (1986). "Effects of environmental abuse are not contained by political lines; strict rules of standing that might be appropriate in other contexts have no application where broad and long-term effects are involved." *Bozung,* 13 Cal.3d at 272, 118 Cal.Rptr. 249, 529 P.2d 1017. Therefore, Lewis, Lloyd, and Fazekas have standing "to seek a writ of mandate pursuant to the public right/duty exception to the beneficial interest requirement." *Save the Plastic Bag Coalition,* at *9.

■■■ VHS and PHH assert that Prime lacks standing because it is no more than an economic competitor. *See, e.g., Waste Mgmt.,* 79 Cal.App.4th at 1235, 94 Cal. Rptr.2d 740 ("[C]ommercial and competitive interests are not within the zone of interests CEQA was intended to preserve or protect and cannot serve as a beneficial interest for purposes of the standing requirement."); *Regency Outdoor Advertising, Inc. v. City of West Hollywood,* 153 Cal.App.4th 825, 829–30, 63 Cal.Rptr.3d 287 (2007) (holding that an outdoor advertising company did not have standing because it had no beneficial interest and was urging CEQA review to pursue its commercial interests against competitors). However, the court need only find that one petitioner has standing to proceed. *See, e.g., Watt v. Energy Action Educ. Found.,* 454 U.S. 151, 160, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981) ("There are three

groups of plaintiffs in this litigation. . . . Because we find [that one of the groups] has standing, we do not consider the standing of the other plaintiffs."); *Laub v. U.S. Dept. of Interior,* 342 F.3d 1080, 1086 (9th Cir.2003) ("Because the individual plaintiffs have standing, we need not consider whether the farm bureau has standing."). Having determined that Lewis, Lloyd, and Fazekas each have standing and the petitioners having raised the same questions of fact and law concerning the review of a single administrative action, the standing objections of VHS and PHH are overruled.

2. *Prime, Lewis, Lloyd, and Fazekas Failed to Exhaust Administrative Remedies*

■■■■■ "Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action." *Bakersfield Citizens for Local Control v. City of Bakersfield,* 124 Cal.App.4th 1184, 1199, 22 Cal.Rptr.3d 203 (2004). Section 21177 of the California Public Resources Code states, in pertinent part:

(a) No action or proceeding may be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination.

(b) No person shall maintain an action or proceeding unless that person objected to the approval of the project orally or in writing during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination. . . .

(e) This section does not apply to any alleged grounds for noncompliance with this division for which there was no public hearing or *other opportunity for members of the public to raise those objections orally or in writing prior to the approval of the project,* or if the public agency failed to give the notice required by law.

Cal. Pub. Res.Code § 21177 (emphasis added). "The purpose of the rule of exhaustion of administrative remedies is to provide an administrative agency with the opportunity to decide matters in its area of expertise prior to judicial review." *Napa Citizens for Honest Gov't v. Napa County Bd. of Supervisors,* 91 Cal.App.4th 342, 384, 110 Cal.Rptr.2d 579 (2001). "[T]he decision making body 'is entitled to learn the contentions of interested parties before litigation is instituted.'" *Corona–Norco Unified School Dist. v. City of Corona,* 17 Cal.App.4th 985, 997, 21 Cal.Rptr.2d 803 (1993) (quoting *Citizens Ass'n for Sensible Dev. of Bishop Area v. County of Inyo,* 172 Cal.App.3d 151, 162–63, 217 Cal.Rptr. 893 (1985)). "It is no hardship . . . to require a layman to make known what facts are contested." *Citizens Ass'n for Sensible Dev.,* 172 Cal.App.3d at 163, 217 Cal.Rptr. 893.

VHS and PHH contend that Prime, Lewis, Lloyd, and Fazekas did not exhaust their administrative remedies because they failed to raise their CEQA objections during the VHS administrative proceedings, and therefore, are now barred from challenging approval of the ASA under CEQA. Prime, Lewis, Lloyd, and Fazekas dismiss the exhaustion requirement as inapplicable, arguing that VHS made a determination that the proposed ASA was not a project subject to CEQA but did not file a notice of determination nor permit public comment on its proposed decision.

VHS held several public meetings at which VHS's Board of Directors considered, and ultimately approved, the sale of assets to PHH. They were not public hearings held pursuant to CEQA, but they were either regular or special meetings of the VHS Board of Directors duly noticed under the Brown Act and open to the public.

On June 29, 2009, the VHS Board of Directors announced at a public meeting its intention to explore a sale of its assets as part of a "dual track in addressing [VHS's] severe financial problems." AR00026. Not less than four duly noticed public meetings were held after June 26, 2009, at which VHS's Board of Directors considered a sale of its assets prior to approval of the ASA—July 15, 2009; July 27, 2009; September 16, 2009; and October 6, 2009. At three of these meetings, VHS considered PHH's proposal to purchase VHS's assets and its plan to manage the assets in a manner that would keep the hospitals open to the public and operated at a greater level of efficiency and profitability. Members of the public were given an opportunity to address VHS's Board of Directors at each of these meetings and comment on the issue.

On July 27, 2009, at least 23 participants at the meeting spoke regarding VHS's potential sale of its assets and the proposed letter agreement with PHH. According to the minutes of the July 27th meeting, "[s]everal members of the public expressed their concern that the Board is entering into an exclusivity agreement to negotiate with only one party and asked why the Board would preclude other interested parties from submitting proposals."

AR00201. Sarrao and Fazekas attended the meeting and objected to the proposed letter agreement. AR00209; AR00217. However, no person who addressed VHS's Board of Directors at the meeting raised objections or offered evidence suggesting that PHH's purchase of VHS's assets would impact the environment or result in a violation of either CEQA or California Government Code § 65402.

At least 16 individuals addressed the VHS Board of Directors at the meeting on September 16, 2009, regarding VHS's potential sale of its assets and the proposed MOU/TS. According to the minutes of the September 16th meeting, Dr. Alex Denes, speaking on behalf of PHH, addressed the attendees and described PHH's membership and goals. Dr. Denes stated that approximately 130 local doctors had committed to join PHH. Dr. Denes explained that if PHH was able to purchase the assets of VHS, PHH would promote a "community-based hospital system and access to healthcare services." AR01397. PHH, according to Dr. Denes, would "continue the mission of public service," "[lift] VHS out of bankruptcy and [keep] local hospitals and emergency rooms open." *Id.* No person who addressed VHS's Board of Directors at the meeting raised objections or offered evidence suggesting that PHH's purchase of VHS's assets would impact the environment or result in a violation of either CEQA or California Government Code § 65402.[118]

On October 6, 2009, the VHS Board of Directors considered approval of the ASA between VHS and PHH. At least 18 participants spoke at the meeting, including representatives for PHH and Prime. Troy

---

118. By letter dated September 21, 2009, Prime requested that VHS disclose 11 categories of documents pursuant to California Government Code § 6250, *et seq.*, including documents regarding the MOU/TS and ongoing negotiations between VHS and PHH. None of the documents requested by Prime concerned the environmental impact, if any, of the proposed sale. AR01563–AR01564.

Schell ("Schell"), Assistant General Counsel for Prime Healthcare Services, Inc., stated that the decision to sell VHS's assets to PHH was "horribly flawed" and violated the "Cortese Statute." AR01612; AR01650–AR01652. Neither Schell nor any other person in attendance, however, raised any objection or offered evidence suggesting that PHH's purchase of VHS's assets would impact the environment or result in a violation of either CEQA or California Government Code § 65402.

CEQA's exhaustion requirement applies because the "the public meetings held constituted 'an *other opportunity* for members of the public to raise ... objections orally or in writing prior to the approval of the project.'" *Mani Bros. Real Estate Group v. City of L.A.,* 153 Cal.App.4th 1385, 1395, 64 Cal.Rptr.3d 79 (2007) (emphasis in original); *See Friends of Mammoth v. Board of Supervisors of Mono County,* 8 Cal.3d 247, 267, 104 Cal.Rptr. 761, 502 P.2d 1049 (1972) (holding that the agency "is entitled to learn the contentions of interested parties before litigation is instituted ...," but it is sufficient if other members of the public raised the issues to be litigated because then the agency would have had "its opportunity to act and to render the litigation unnecessary, if it had chosen to do so").

■■■ It is undisputed that Lewis and Lloyd did not attend or participate in any of the public meetings that preceded VHS's approval of the ASA. Prime and

Fazekas attended one or more of the meetings, but neither objected, either orally or in writing, that VHS's proposed sale of assets to PHH would cause an environmental impact or result in a violation of either CEQA or California Government Code § 65402. Because Prime, Lewis, Lloyd, and Fazekas had ample opportunity during the administrative proceedings to raise their objections, but failed to give VHS the " 'opportunity to receive and respond to articulated factual issues and legal theories before its actions [were] subjected to judicial review,' " they are now barred from challenging the transaction under either CEQA or California Government Code § 65402.[119] *See Mani Bros. Real Estate Group,* 153 Cal.App.4th at 1396, 64 Cal.Rptr.3d 79 (quoting *Coalition for Student Action v. City of Fullerton,* 153 Cal.App.3d 1194, 1198, 200 Cal.Rptr. 855 (1984)). Notwithstanding their failure to properly exhaust administrative remedies, the challenges asserted by Prime, Lewis, Lloyd, and Fazekas pursuant to CEQA and California Government Code § 65402 fail on the merits.

### 3. VHS's Sale of Assets to PHH Does Not Constitute a "Project" Subject to CEQA

■■■ "A party may seek to set aside an administrative decision for failure to comply with CEQA by petitioning for either administrative mandamus or tradi-

---

**119.** The cases cited by the petitioners can be distinguished on the facts: *Santa Teresa Citizen Action Group v. City of San Jose,* 114 Cal.App.4th 689, 702, 7 Cal.Rptr.3d 868 (2003) (finding that the exhaustion requirement did not apply because "there was no clearly defined administrative procedure for petitioners to resolve their concerns about the project as it was finally configured"); *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster,* 52 Cal.App.4th 1165, 1209, 61 Cal.Rptr.2d 447 (1997) (noting that

"the State Board *admitted* that Watermaster had exhausted its administrative remedies before seeking judicial review") (emphasis in original); *Castaic Lake Water Agency v. City of Santa Clarita,* 41 Cal.App.4th 1257, 1266, 49 Cal.Rptr.2d 79 (1995) (holding that the trial court's finding that petitioner failed to exhaust administrative remedies was error because the board ignored petitioner's request for a delay in the proceedings before concluding that the project was exempt).

tional mandamus." *Western States Petroleum Ass'n v. Superior Court,* 9 Cal.4th 559, 566, 38 Cal.Rptr.2d 139, 888 P.2d 1268 (1995) (internal citations omitted). Judicial review of the agency's decision is limited to "whether there was a prejudicial abuse of discretion." Cal. Pub. Res.Code § 21168.5. "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." *Id.* When a quasi-legislative administrative decision is attacked on the grounds that the agency "has not proceeded in an manner required by law," judicial review is confined to the administrative record and matters properly subject to judicial notice.[120] *See Western States Petroleum Ass'n,* 9 Cal.4th at 576, 38 Cal.Rptr.2d 139, 888 P.2d 1268; *Carrancho v. Cal. Air Res. Bd.,* 111 Cal. App.4th 1255, 1269, 4 Cal.Rptr.3d 536 (2003). "In dealing with an agency's conclusion that the action in question was not a project within the meaning of CEQA, however, the trial court can employ its own analysis of undisputed facts in the record and decide the question as a matter of law without deference to the agency's decision." *Friends of the Sierra,* 147 Cal. App.4th at 652, 54 Cal.Rptr.3d 500.

Petitioners argue that the proposed sale of assets to PHH under the ASA is an activity undertaken by VHS that may cause a reasonably foreseeable indirect physical change to the environment, and therefore, is a "project" for purposes of CEQA. They point to the following in the 1,822–page administrative record as evidence of PHH's announced development plan with respect to the vacant parcels adjacent to Menifee Hospital:

● PHH announced its intention in a letter to VHS to develop the vacant parcels with medical office buildings and hospital supporting uses: "PHH, with its physician shareholders, have a goal to work with real estate partners to construct a medical arts building at the Menifee medical campus in order to return physicians and services to the Menifee area." AR00369.

● The appraisal for the vacant land states that the highest and best use for the land is as "medical or institutional use"—i.e., precisely the type of building PHH said it plans to build at Menifee. AR00552; AR00554 ("the excess land site could be sold or used for expansion of the hospital.").

● There are existing plans to expand Menifee, which PHH will be able to use for its development plans. AR00543 ("There is a contingency expansion plan to add approximately 107,000 square feet dependent on population growth in the area and the development of medical office buildings in the subject's immediate vicinity.").

Plaintiff's Trial Brief, 21:1–14. Petitioners contend that PHH's stated goal for the future of Menifee Hospital, coupled with the VHS's existing contingency expansion plan, is sufficient to support a finding that PHH has a development plan for Menifee Hospital, that an indirect physical change to the environment is reasonably foreseeable as a result of such development plan,

---

**120.** In conjunction with its decision to grant VHS's motion for protective order, the court previously determined that VHS's decision to sell its assets to PHH was a quasi-legislative administrative decision, not a ministerial or informal action that would permit the consideration of extra-record evidence on judicial review. *See Friends of the Sierra R.R. v. Tuolumne Park & Recreation Dist.,* 147 Cal. App.4th 643, 652, 54 Cal.Rptr.3d 500 (2007) ("There is no doubt that a public agency's decision to sell a piece of property it wishes to dispose of is nonadjudicatory in character....").

and therefore, the sale of the assets to PHH is a "project" within the regulatory scheme of CEQA. In support of their contention, the petitioners rely on *Laurel Heights Improvement Ass'n v. Regents of the Univ. of Cal.*, 47 Cal.3d 376, 253 Cal. Rptr. 426, 764 P.2d 278 (1998). According to the petitioners, *Laurel Heights* compels the conclusion that VHS was required by CEQA to "analyze the impacts of that development, including potential traffic, air pollution, destruction of agricultural land, and other impacts," before approving the ASA and its failure to do so violated the statute.[121]

In *Laurel Heights*, the University of California at San Francisco ("UCSF") had identified serious space constraints impacting its Schools of Medicine, Nursing, Pharmacy, and Dentistry at UCSF's Parnassus campus in a long range plan prepared in 1982. *Laurel Heights*, 47 Cal.3d at 388, 253 Cal.Rptr. 426, 764 P.2d 278. To address the space issue, UCSF purchased a complex known as the Presidio Corporate Center in Laurel Heights—a 10–acre site that included an existing 340,000 square-foot building and a 13,000 square-foot annex. *Id.* Initially, UCSF believed that the transaction was exempt from CEQA, reasoning that the purchase would not affect the environment because "the relocation to Laurel Heights would involve only the acquisition and operation of an existing facility and negligible or no expansion of existing use at the facility." *Id.* However, UCSF reconsidered its own decision given its plan to relocate the School of Pharmacy's biomedical research units to Laurel

Heights. *Id.* at 388–89, 253 Cal.Rptr. 426, 764 P.2d 278.

UCSF prepared a draft environmental impact report ("EIR") which disclosed that the biomedical research units to be relocated would handle hazardous substances, including substances that were toxic, carcinogenic, and radioactive. *Id.* at 389, 253 Cal.Rptr. 426, 764 P.2d 278. According to the draft EIR, a relocation to Laurel Height would impact the environment in a number of ways, such as "direct and cumulative effects on air quality caused by laboratory emissions vented into the outside air and effects on human health from exposure to hazardous chemicals" as well as "noise, traffic congestion, and parking." *Id.* UCSF certified the final EIR following a public meeting held after expiration of a 45–day notice and comment period. *Id.* The Laurel Heights Neighborhood Improvement Association ("Association"), which was concerned that the research to be conducted at the location presented an unacceptable risk to the residential neighborhood, petitioned for a writ of mandate to set aside UCSF's EIR approval. *Id.* The trial court denied the petition, holding that UCSF had "certified the EIR in a manner required by law and that their action was supported by substantial evidence." *Id.* The court of appeal reversed, finding, in pertinent part, that "the EIR did not adequately describe the 'project' within the meaning of CEQA because the EIR did not discuss future cumulative effects of the relocation of additional UCSF operations to the Laurel Heights site." *Id.* The California Supreme Court affirmed on that point,[122] holding that "a public

---

**121.** *Id.*, 22:7–8.

**122.** The California Supreme Court affirmed "the Court of Appeal's decision that the EIR should have addressed anticipated future uses and their environmental effects and that the discussion of project alternatives [was] inadequate under CEQA." *Id.* at 427. The court

also affirmed "the Court of Appeal's decision that the Association [was] entitled to its attorneys fees," but reversed and remanded with respect to "the Court of Appeal's decision that the Regents' finding as to mitigation [was] inadequate." *Id.* at 427–28.

agency's approval of a project or future portions of a project is not a prerequisite for an environmental impact report under CEQA." *Id.* at 395, 253 Cal.Rptr. 426, 764 P.2d 278. The court further held that "an EIR must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." *Id.* at 396, 253 Cal.Rptr. 426, 764 P.2d 278. In so holding, the court observed:

> A basic tenet of CEQA is that an environmental analysis "should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment." [UCSF] correctly note[s] that "where future development is unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as to future environmental consequences." We agree that environmental resources and the public fisc may be ill served if the environmental review is too early. On the other hand, the later the environmental review process begins, the more bureaucratic and financial momentum there is behind a proposed project, thus providing a strong incentive to ignore environmental concerns that could be dealt with more easily at an early stage of the project. This problem may be exacerbated where, as here, the public agency prepares and approves the EIR for its own project. For that reason, "EIRs should be prepared as early in the planning process as possible to enable environmental considerations to influence project, program or design."

*Id.* at 395, 253 Cal.Rptr. 426, 764 P.2d 278 (emphasis in original) (internal citations omitted).

*Laurel Heights* is distinguishable on the facts. In *Laurel Heights,* it was undisputed that UCSF's relocation to the Laurel Heights neighborhood was a "project" within the scope of CEQA. *Id.* at 391 n. 3, 253 Cal.Rptr. 426, 764 P.2d 278 ("The Regents do not dispute that the University of California is a 'public agency' and that the relocation to Laurel Heights is a 'project' under CEQA.") (citations omitted). In this case, VHS and PHH deny that the proposed ASA is a "project" subject to the requirements of CEQA. In *Laurel Heights,* UCSF had disclosed in the EIR, as well as public announcements, newsletters, and correspondence, its commitment to develop the Laurel Heights facility "as a biomedical research facility, with cross-disciplinary programs from all schools" once the site became fully available in 1995. *Id.* at 397, 253 Cal.Rptr. 426, 764 P.2d 278. There was evidence that "[t]he anticipated eventual use of the entire Laurel Heights facility would include an increase in the amount of space used from approximately 100,000 square feet to 354,000 square feet and an increase in occupants from approximately 460 to 860." *Id.* at 398, 253 Cal. Rptr. 426, 764 P.2d 278. Given its long-term plan and the foreseeable change in the scope of the project, the court concluded that UCSF could "provide meaningful, reliable data in the EIR as to future activity at Laurel Heights and thus must do so." *Id.* No such facts exist in this case.

*Friends of the Sierra,* on the other hand, is directly in point. In that case, the Tuolumne Park and Recreation District ("TPRD") sold a tract of land to the Tuolumne Band of Me–Wuk Indians (the "Tribe"), which included a historic railroad right-of-way that ran across a portion of the Tribe's 300–acre property. *Friends of*

*the Sierra,* 147 Cal.App.4th at 649, 54 Cal. Rptr.3d 500. The TPRD did not undertake a CEQA review of the transaction, despite having been advised by Friends of the Sierra Railroad ("FSR"), a preservation group, that the sale was subject to CEQA because of the historical significance of the right-of-way. *Id.* at 649–50, 54 Cal.Rptr.3d 500. Indeed, there was no evidence that the TPRD ever formally considered the necessity of a CEQA review or formally decided that the sale did not merit such a review. *Id.* at 650, 54 Cal. Rptr.3d 500. After the TPRD transferred the property to the Tribe pursuant to a duly adopted resolution, FSR filed a petition for a writ of mandate seeking an order setting aside the transfer and compelling the TPRD to conduct an environmental review pursuant to CEQA before selling the property. *Id.* The trial court denied the petition, holding that "the transfer was not a 'project' within the meaning of CEQA." *Id.* at 650–51, 54 Cal.Rptr.3d 500. In so holding, the court concluded that the evidence in the record did not support a finding that transfer of title to the right-of-way would cause a reasonably foreseeable indirect physical change to the environment "because the view that the Tribe might carry out development plans impacting the historical resource was 'based on sheer speculation … and any attempt to analyze undisclosed plans would necessarily be purely hypothetical and premature.'" *Id.* at 651, 54 Cal.Rptr.3d 500. The court of appeals affirmed, stating that "the lack of announced development plans meant that no identifiable impact on the historical resource itself … was foreseeable." *Id.* at 661–62, 54 Cal.Rptr.3d 500. The court explained:

It is true that development of the [subject] property by the Tribe is reasonably foreseeable. It is also reasonable to infer that the Tribe acquired the right-of-way crossing in order to facilitate this development. Further, it is possible that the development eventually undertaken could have a variety of CEQA-cognizable impacts on the historical resource. . . .

The reasonably foreseeable likelihood of some development on the [subject] property, combined with the possibility that the development could impact the historical resource included within the larger property, does not trigger CEQA review. CEQA review has to happen far enough down the road toward an environmental impact to allow meaningful consideration in the review process of alternatives that could mitigate the impact. If TPRD knew, for instance, that the Tribe intended to damage the historical resource by building a structure in the right-of-way, or knew of a plan to devote the right-of-way to a use inconsistent with the county's general plan, it could have rejected the deal or conditioned the transfer on the Tribe's covenant not to do those things. As it was, no specific plans were on the table. The Tribe has not proposed any development that would affect the historical resource. The only statement it has made on the subject is its letter requesting a determination of consistency with the county general plan, in which it said it 'proposes' to use the right-of-way for public hiking trails.

*Id.* at 656–57, 54 Cal.Rptr.3d 500 (emphasis in original). The court rejected FSR's argument that CEQA review was improperly avoided by the Tribe, noting that the County of Tuolumne would have the opportunity in the future "to engage in CEQA review if development plans became concrete." *Id.* at 660, 54 Cal.Rptr.3d 500. "The fact that future review will have to be performed by another agency cannot convert a meaningless review process into a meaningful one or convert a

nonproject into a project." *Id.* at 661, 54 Cal.Rptr.3d 500.

■ In this case, the court concludes that VHS's sale of assets to PHH pursuant to the ASA is not a "project" for purposes of CEQA. *See, e.g., Friends of the Sierra,* 147 Cal.App.4th at 657 n. 2, 54 Cal.Rptr.3d 500 ("The parties frame the issue as whether there is a project; their dispute in essence is over whether there is a sufficient causal relationship between the land transfer and the anticipated future development and whether enough was known about that development at the time of the transfer to allow for meaningful environmental review."); *Kaufman & Broad–South Bay, Inc. v. Morgan Hill Unified School Dist.,* 9 Cal.App.4th 464, 471, 11 Cal.Rptr.2d 792 (1992) (" 'Where it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment, the activity is not subject to CEQA.' ") (citation omitted). The fact that the VHS Board of Directors may not have either formally considered the necessity of a CEQA review or formally determined that the ASA was not a "project" subject to CEQA prior to approval of the ASA was not an abuse of discretion. *See Friends of the Sierra,* 147 Cal.App.4th at 657, 54 Cal. Rptr.3d 500.

■ Nor is there evidence in the administrative record that VHS's approval of the ASA will potentially cause either a direct physical change in the environment or a reasonably foreseeable indirect physical change in the environment. There is, however, substantial evidence in the record that the purpose of the ASA was to maintain the operational status quo by keeping the hospitals operating and open to the public. While PHH may have a long-term "goal" for the establishment of a medical arts building near the Menifee Hospital,[123] there is no credible evidence of a present commitment by PHH to such a

---

123. In a letter to Cherry dated July 27, 2009, Sreenivasa R. Nakka, M.D., President of PHH, discussed "some of the substantial benefits" that would result from a sale of VHS's assets to PHH. AR000368. Dr. Nakka also identified the following five "goals" of PHH:

1. PHH, with its physician shareholders have a goal to expand the cardiac care initiative by expanding its 13 year association with Catholic Healthcare West with the goal that we become a Center of Excellence in Southern California similar to CHW's Centers of Excellence at City of Hope and UCLA. An agreement documenting CHW's association with PHH is currently under review with CHW's legal counsel.

2. PHH, with its physician shareholders, have a goal to provide new resources for surgical and other state of the art medical procedures and infrastructure. One of our primary goals is to modernize the entire VHS system.

3. PHH, with its physician shareholders, have a goal to develop state of the art outpatient facilities such as surgery centers in order to provide faster and more appropriate patient care for the community.

4. PHH, with its physician shareholders, have a goal to develop a comprehensive integrated healthcare delivery system to provide a Local Healthcare Information Organization eliminating costly duplication of tests, providing electronic medical records and providing necessary patient documentation for better financial reimbursements from the payer network.

5. PHH, with its physician shareholders, have *a goal to work with real estate partners to construct a medical arts building at the Menifee medical campus in order to return physicians and services to the Menifee area.* Many physicians and ancillary services have migrated south along the I–215 corridor.

AR00369 (emphasis added). Interestingly, Prime's counsel did not accord much weight to Dr. Nakka's letter earlier in the litigation, admitting in final argument that he had once referred to the letter as an example of the "irrelevant fluff" that VHS had allegedly "stuffed" into the administrative record. *See* Opposition to Motion for Protective Order and for Order Excluding Extra–Record Evidence in Mandamus Proceeding, 4:17–20.

project or that "the project is well enough defined to allow for meaningful evaluation." *See Save Tara v. City of W. Hollywood,* 45 Cal.4th 116, 130, 84 Cal.Rptr.3d 614, 194 P.3d 344 (2008) (recognizing the "two considerations of legislative policy important to the timing of mandated EIR preparation: (1) that CEQA not be interpreted to require an EIR before the project is well enough defined to allow for meaningful environmental evaluation; and (2) that CEQA not be interpreted as allowing an EIR to be delayed beyond the time when it can, as a practical matter, serve its intended function of informing and guiding decision makers."). The administrative record is devoid of any evidence that PHH has formulated a reasonably definite proposal as to the future use of the vacant land adjacent to Menifee Hospital upon which the court could base a finding that an indirect physical change to the environment is reasonably foreseeable as a result of VHS's approval of the ASA.[124] VHS's approval of the ASA results in nothing more than a change of ownership of VHS's assets. If at some future date PHH presents a specific plan or concrete proposal to develop the 20–acre parcel presently used by VHS as an orchard into a medical arts building, the future use of the property as

a medical arts building would then be ripe for CEQA review and one or more of the petitioners would then have the opportunity to express their concerns over PHH's future use of the property without engaging "in sheer speculation as to future environmental consequences." *See Laurel Heights,* 47 Cal.3d at 395, 253 Cal.Rptr. 426, 764 P.2d 278. Based on the foregoing, the court finds that the VHS Board of Directors proceeded in a manner required by law and its decision is supported by substantial evidence. The petitioners' CEQA challenge will be dismissed.

**4.** *Petitioners Have Failed to Establish a Violation of California Government Code § 65402*

Petitioners claim that VHS never gave the cities of Hemet and Sun City or the County of Riverside an opportunity to review its proposed sale of assets under the ASA to determine whether the sale would be consistent with the terms of the general plan, if any, adopted in each of these jurisdictions, and that VHS's failure to do so violated California Government Code § 65402.

 Section 65402(c) states, in pertinent part, that "[a] local agency shall not

---

**124.** There is nothing in the ASA binding PHH to develop one or more of the three vacant parcels adjacent to Menifee Hospital as a medical arts building at any time in the future. AR01721–AR01822. In its appraisal of Menifee Hospital and the Menifee—Adjacent Vacant Parcels dated August 21, 2009, V & IG concluded that "the excess land site could be sold or used for expansion of the hospital." AR00554. However, there is nothing in V & IG's valuation of the front surplus parcel, rear surplus parcel, or orchard site concerning any present or future plan for expansion of the hospital or development of the site. V & IG notes in its appraisal of Menifee Hospital that "[t]he fourth floor is currently in shell condition and will be built out based on the hospital's future needs." AR00543. The hospital was built in 1982 and currently has 84

beds. According to the appraisal, the fourth floor can be finished to accommodate another 24 beds. V & IG also notes that "[t]here is a contingency expansion plan to add approximately 107,000 square feet dependent on population growth in the area and the development of medical office buildings in the subject's immediate vicinity." *Id.* It is clear from the text of this statement that it refers to an existing plan created by VHS for the expansion of Menifee Hospital that pre-dated the ASA and was contingent upon both a demand for services by an increased population and medical professionals relocating in the vicinity of the hospital. This statement cannot be interpreted as an announced plan by PHH for development of the site beyond its current use.

... dispose of any real property ... in any county or city, if such county or city has adopted a general plan or part thereof and such general plan or part thereof is applicable thereto, until the location, purpose and extent of such ... disposition ... [has] been submitted to and reported upon by the planning agency having jurisdiction, as to conformity with said adopted general plan or part thereof." Cal. Gov't.Code § 65402(c). Petitioners did not specifically identify VHS's alleged violation of § 65402 as one of the Challenge Actions,[125] but they included the claim as a disputed issue in the Joint Pretrial Order signed on February 22, 2010.[126] Nevertheless, the petitioners failed to submit evidence at the hearing concerning either the existence of a general plan in the cities of Hemet or Sun City or the County of Riverside or, more importantly, the specific provisions of each general plan ostensibly applicable to VHS's proposed sale of assets to PHH. Even if the petitioners had succeeded in identifying an applicable general plan or component thereof, the procedure specified in § 65402 is purely advisory. Cal. Gov't.Code § 65402(c) ("If the planning agency disapproves the location, purpose or extent of such ... disposition, ... the disapproval may be overruled by the local agency."); *See Envtl. Defense Fund, Inc. v. Coastside County Water Dist.*, 27 Cal. App.3d 695, 702, 104 Cal.Rptr. 197 (1972)

(stating that "the planning agency has been given no power under the act to 'veto' the project and to prevent its construction"). Finally, § 65402 merely requires VHS to consult with the local planning agencies at some point before ultimately "disposing" of its property. If § 65402(c) is indeed applicable, VHS can still submit the proposed sale of its assets to the appropriate agency at any time prior to a transfer of the assets to PHH. Accordingly, the petitioners' challenge under California Government Code § 65402 will be dismissed.

**E.** *VHS's ASA With PHH Did Not Require Approval by the Riverside LAFCO*

■ It is undisputed that VHS is a special district located within the geographic boundaries of the Riverside LAFCO, and that the VHS Board of Directors did not apply to the Riverside LAFCO for approval of its proposed sale of assets to PHH. Petitioners do not cite any authority for the proposition that a California health care district, which elects to sell 50% or more of the district's assets pursuant to the authority granted under the LHCDL, California Health & Safety Code § 32121(p)(1), must also comply with Cortese–Knox. Petitioners argue, however, that VHS was required to comply with Cortese–Knox[127] because VHS's sale of

---

**125.** *See* Stipulation *supra* note 39.

**126.** Joint Pre–Trial Order, 35:1–3.

**127.** The specific provision of Cortese–Knox allegedly violated by VHS is California Government Code § 56824.12, which states:

(a) A proposal by a special district to provide a new or different function or class of services or divestiture of the power to provide particular functions or classes of services within all or part of the jurisdictional boundaries of a special district, pursuant to subdivision (b) of Section 56654, shall be made by the adoption of a resolu-

tion of application by the legislative body of the special district and shall include all of the matters specified for a petition in Section 56700, except paragraph (6) of subdivision (a) of Section 56700, and be submitted with a plan for services prepared pursuant to Section 56653. The plan for services for purposes of this article shall also include all of the following information:

(1) The total estimated cost to provide the new or different function or class of services within the special district's jurisdictional boundaries.

substantially all of its assets to PHH results in a "divestiture of the power to provide particular functions or classes of services within ... the jurisdictional boundaries of [the] district." Cal. Gov't Code § 56824.12(a). Petitioners argue that, in addition to satisfying the requirements of California Health & Safety Code § 32121(p)(1), the VHS Board of Directors was required to adopt a resolution containing specified information concerning the proposed ASA with PHH, conduct a public hearing on the resolution, and give any interested person an opportunity to appear and provide oral or written testimony on the resolution.

■■■ Cortese–Knox provides for the creation of local agency formation commissions ("LAFCOs") "to control the process of municipality expansion." *Sierra Club v. San Joaquin Local Agency Formation Comm'n,* 21 Cal.4th 489, 495, 87 Cal. Rptr.2d 702, 981 P.2d 543 (1999). Cortese–Knox authorized the formation of LAFCOs to curb "urban sprawl," preserve "open-space and prime agricultural lands, efficiently [provide] government services" and encourage "the orderly formation and development of local agencies based upon local conditions and circumstances." Cal. Gov't Code § 56301. Cortese–Knox is intended to promote "planned, well-ordered, efficient urban development patterns with appropriate consideration of preserving open-space and agricultural lands within those patterns." Cal. Gov't Code § 56300(a). Pursuant to Cortese–Knox, LAFCOs are authorized "[t]o review and approve or disapprove with or without amendment, wholly, partially, or conditionally, proposals for *changes of organization* or reorganization," [128] including the consoli-

---

(2) The estimated cost of the new or different function or class of services to customers within the special district's jurisdictional boundaries. The estimated costs may be identified by customer class.

(3) An identification of existing providers, if any, of the new or different function or class of services proposed to be provided and the potential fiscal impact to the customers of those existing providers.

(4) A written summary of whether the new or different function or class of services or divestiture of the power to provide particular functions or classes of services, within all or part of the jurisdictional boundaries of a special district, pursuant to subdivision (b) of Section 56654, will involve the activation or divestiture of the power to provide a particular service or services, service function or functions, or class of service or services.

(5) A plan for financing the establishment of the new or different function or class of services within the special district's jurisdictional boundaries.

(6) Alternatives for the establishment of the new or different functions or class of services within the special district's jurisdictional boundaries.

(b) The clerk of the legislative body adopting a resolution of application shall file a certified copy of that resolution with the executive officer. Except as provided in subdivision (c), the commission shall process resolutions of application adopted pursuant to this article in accordance with Section 56824.14.

(c)(1) Prior to submitting a resolution of application pursuant to this article to the commission, the legislative body of the special district shall conduct a public hearing on the resolution. Notice of the hearing shall be published pursuant to Section 56153 and 56154.

(2) Any affected local agency, affected county, or any interested person who wishes to appear at the hearing shall be given an opportunity to provide oral or written testimony on the resolution.
Cal. Gov't Code § 56824.12.

128. "Change of organization," as used in Cortese–Knox, includes "[a] proposal for the exercise of new or different functions or classes of services, or divestiture of the power to provide particular functions or classes of services, within all or part of the jurisdictional boundaries of a special district." Cal. Gov't Code § 56021(h). The term "function" means "any *power* granted by law to a local agency or a county to provide designated governmental or proprietary services or facilities

dation of districts, the dissolution or merger of a district, and the creation of subsidiary districts. Cal. Gov't Code § 56375(a)(1) & (2) (emphasis added). Cortese–Knox is a "comprehensive scheme governing district formation and dissolution." *Las Tunas Beach Geologic Hazard Abatement Dist. v. Superior Court,* 38 Cal. App.4th 1002, 1008, 45 Cal.Rptr.2d 529 (1995). However, "Cortese–Knox is not the sole statutory scheme pertaining to district formation." *Id.* at 1009, 45 Cal. Rptr.2d 529. Nor is Cortese–Knox the only statute governing "district changes of organization." *Id.* at 1011, 45 Cal.Rptr.2d 529. It must be construed in light of "other, more specific statutes, pertaining to [such] changes of organization." *Id.*

▆▆▆ Cortese–Knox's broad definition of "district" includes a local health care district,[129] such as VHS. However, the general provisions of Cortese–Knox applicable to district formation do not apply to the creation of a local health care district because such districts must be formed pursuant to the specific procedures set forth in the LHCDL, California Health & Safety Code § 32000, *et seq. Cf. Las Tunas Beach,* 38 Cal.App.4th at 1010, 45 Cal. Rptr.2d 529 (stating that "the general

provisions of Cortese–Knox pertaining to *district formation* do not apply to the formation of a [Geologic Hazard Abatement District ("GHAD")] because the law dealing with GHAD's contains its own more specific formation procedures ...") (emphasis in original). To the extent that a change of organization is not specifically covered by the LHCDL, Cortese Knox applies "thereby filling any gaps in the legislative scheme." *See Id.* at 1013, 45 Cal.Rptr.2d 529.

In this case, the court finds that VHS's sale of assets to PHH pursuant to the ASA does not constitute a "change of organization" within the meaning of Cortese–Knox. Consummation of the transaction with PHH will result in a transfer of assets, but it will not change the structure of VHS nor divest VHS of the power to provide health care services within the district. VHS will continue to retain its status as a local health care district after the sale of assets to PHH pursuant to the ASA.[130] The LHCDL mandates a specific statutory procedure for the sale of assets by a local health care district. VHS complied with that procedure when it negotiated and executed the ASA. The LHCDL specifically

---

for the use, benefit, or protection of persons or property." Cal. Gov't Code § 56040 (emphasis added).

**129.** "District" or "special district," as used in Cortese–Knox, means "an agency of the state, formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries." Cal. Gov't Code § 56036(a). A hospital district is not one of the governmental entities specifically excluded from the definition of "district" or "special district" contained in the statute. *Id.*

**130.** VHS will provide charitable community services similar to other health care districts that no longer operate hospitals. Pursuant to § 1.7 of the ASA, VHS retains, among other things, all of the assets of Hemet Hospital Foundation, Menifee Valley Medical Center

Foundation (a/k/a Foundation for the Menifee Valley Medical Center), Moreno Valley Community Health Foundation, Hemet Valley Hospital Auxiliary, Menifee Valley Medical Center Auxiliary, and the Moreno Valley Community Hospital Auxiliary, together with approximately $807,000 in funds received from the Estate of Beatrice Brown which are restricted to charitable use for services to disabled children. Furthermore, PHH must "[p]rovide $400,000 per year to [VHS], commencing on the Sale Closing Date, for a period of five (5) years for use by the District, among other things, to pay its ongoing operating expenses, including payroll and professional fees, and to fund any necessary elections...." Modified First Amended Plan, 19:13–15.

authorizes VHS to "transfer, at fair market value, any part of its assets to one or more nonprofit corporations to operate and maintain the assets." Cal. Health & Safety Code § 32121(p)(1). Because the sale to PHH involves more than 50% of its VHS's assets, VHS by resolution scheduled a special election and submitted to voters of the district a measure proposing the transfer as required by the LHCDL. *Id.* The proposed transfer was approved after receiving the affirmative vote of an overwhelming majority of the voters in the district. *Id.* To the extent the requirements of Cortese–Knox may conflict with the exclusive procedure for the transfer of assets contained in the LHCDL, the more specific provisions of the LHCDL control. For these reasons, the court finds that VHS was not required to obtain approval of the ASA from the Riverside LAFCO prior to a sale or transfer of assets to PHH pursuant to the LHCDL, California Health & Safety Code § 32121(p)(1).

### III. CONCLUSION

For the reasons stated above, the court concludes that VHS is entitled to an order overruling the petitioners' remaining feasibility objection and confirming VHS's Modified First Amended Plan, together with a judgment dismissing each of the Challenge Actions with prejudice.

VHS's counsel is directed to lodge a proposed order confirming VHS's Modified First Amended Plan and a judgment with respect to Challenge Actions consistent with this opinion.